COOKS, Judge.
| ¶ This court previously addressed this case upholding the trial court’s grant of summary judgment dismissing the School Board based on its finding that the School Board had no duty to safeguard a child’s well-being after the child leaves the school property. The Louisiana Supreme Court reversed this court and remanded the case for trial. (See S.J. v. Lafayette Parish School Board, 06-2862, (La. 6/29/07), 959 So.2d 884). The trial court rendered judgment after trial on the merits again dismissing the suit against the School Board finding no fault on the part of the Lafayette Parish School Board. Plaintiff timely appealed the trial court’s judgment. We reverse.
DISCUSSION OF FACTS
On November 4, 2004, C.C., a minor child twelve years of age, was sexually attacked by an unknown assailant as she walked home from Lafayette Middle School in Lafayette, Louisiana. The child’s mother, individually and on behalf of her minor daughter, sued the Lafayette Parish School Board. The child was kept after school for Behavior Clinic. On a prior date, the child’s mother signed a document clearly indicating that her child was not allowed to walk home. Testimony at trial from the child, her friend who was with her in Behavior Clinic that date, the assistant principal, the Behavior Clinic Facilitator, the bus driver, and teachers, established that the children had previously *617 been informed they were not allowed to ride the late bus home when held over for Behavior Clinic. C.C. testified that an announcement reminding students of the policy prohibiting Behavior Clinic students from riding the bus home was repeated on November 4, 2004, the day of the incident. Mrs. Brenda Faye Billedeaux, the Behavior Discipline Center Facilitator at Lafayette Middle School, testified at trial “the purpose of Behavior Clinic is not to provide you with j2the luxury of a free ride home. I’m not obliged to find a way for Behavior Clinic students to get home.” (Emphasis added). The uncon-tradicted evidence further established the school had a policy in place that students such as C.C. sent to Behavior Clinic were not allowed to ride any bus home after Behavior Clinic, including the late “tutoring” bus. The trial judge noted in his reasons for judgment that “there is a confusing system relating to bus use by students in behavior clinic, and there is no evidence that this particular student knew she could ride the bus.” (Emphasis added.)
Behavior Clinic ended that day at about 4:15 P.M. According to C.C., she assumed her mother would be at school to pick her up after Behavior Clinic, as she had in the past, and then take she and her friend to Popeyes before taking her friend home. When C.C. got out of Behavior Clinic there was no one at school to pick her up. According to C.C., she went back and forth to the office and to her teacher trying to call home, to no avail. The testimony again undisputably establishes the child’s mother was not informed ahead of time to allow her to make arrangements for her child to get home safely after Behavior Clinic and received no word that day that C.C. needed a ride home. The testimony also established the mother had made such arrangements in the past when she was made aware of the necessity to provide C.C. a way home from school.
S.R.C., C.C.’s classmate, testified as she was leaving the school campus, C.C. approached her and asked if she could walk with her. C.C. and her classmate left the school together at about 4:30 P.M. walking directly up the well-lit and well-trafficked street which passes directly in front of the school, to the Popeyes Fried Chicken establishment located at “four corners” across the street from the city bus stop where her friend caught the bus. This took about 15 minutes. C.C. and her classmate were |sat Popeyes for a short time, about 20 minutes. C.C. had no money and her friend had only enough for her own bus fare.[1] C.C.’s friend crossed the street to catch the city bus and C.C. proceeded to walk home alone. It was already getting dark on this November evening when C.C. continued her walk home. C.C. described the time of day when she was attacked as “night-time.” The walk home from school would normally take about an hour from the school or 45 minutes from the Popeyes establishment. Because C.C. was attacked that day, she did not arrive home until approximately 6:30-6:45. The police were summoned and, according to the officer’s testimony, they arrived at C.C.’s home between 6:30 and 7:00 P.M. After the police questioned C.C. she was transported to the hospital by ambulance where a rape kit was administered which disclosed the presence of semen.[2]
*618 All witnesses agreed, the area through which this 12 year old girl had to walk some two and one-half miles to get home was not safe for any child to walk through and is well known as a high crime area frequented by prostitutes, drug trafficking, and criminal activity. The school teachers, principal, assistant principal, Mrs. Bille-deaux, the janitor, the school bus driver, Plaintiff and her mother, all agreed wholeheartedly and without contradiction that the area through which this child had to walk to get home on Cameron and University streets, known as “four corners,” is a notoriously dangerous area through which no child, or adult, can safely traverse without exposure to harm.[3] The testimony of two Lafayette Police Officers, one in charge of public | information, also established, through both statistical data and personal knowledge, that the area through which C.C. passed to walk home was notoriously dangerous and not safe for her to walk through.
LAW AND ANALYSIS
Louisiana law specifically mandates the School Board must provide free bus transportation to all eligible students. In the previous review of this case by the Louisiana Supreme Court on supervisory writ, Justice Johnson correctly pointed out the provisions of La. R.S. 17:158(A)(1) are “mandatory and requires that the school board shall provide free transportation for students residing more than one mile from the school they attend.” (Emphasis added) S.J., 959 So.2d at 886. This court, in Moreau v. Avoyelles Parish School Board, 04-1613 (La.App. 3 Cir.3/9/05), 897 So.2d 875, specifically held:
“No parish or city school board shall eliminate or reduce the level of transportation services provided to students as required by the provisions of this Section [17:158] except for economically justifiable reasons approved in accordance with the provisions of this Subsection by the State Board of Elementary and Secondary Education.” Moreau at 881-882.
This court further expressly stated in Moreau “the concept of free education in Louisiana includes as a primary element the transportation to and from school.” Id. at 883.
As this court also aptly held in Moreau: La. R.S. 17:158 provides a scheme whereby a city or parish school board is required to provide all students (1) who attend a BESE Board approved elementary or secondary school within its jurisdictional boundaries and (2) who live more than one mile from that school with free transportation to and from the school. The free transportation requirement extends to all approved schools within the jurisdictional | -boundaries ... The only permissible non-fiscal reason for denying this free transportation right to all eligible students is if the school involved discriminates against anyone on the basis of race, creed, color, or national origin. (Emphasis added)
Id. at 882.
The law makes no exceptions based on whether the student is a “good” or “bad” *619 student. The Lafayette Middle School clearly instituted a policy whereby it denied bus transportation to students placed in Behavior Clinic after regular school hours. The policy was made very clear to students including in particular, C.C. She testified that Mr. Pollan and Mrs. Reed told her, and made general announcements to the student body, that students were not allowed to ride the bus home if held over for Behavior Clinic. Particularly noteworthy is C.C.’s response when questioned at trial as to whether she thought to ask the bus driver to see if she could get a ride home on the late school bus even though she had Behavior Clinic that day. C.C. stated: “no cause I didn’t want to go behind Mr. Pollan’s back and get on the bus anyway. I could get suspended.” As noted, even the trial judge found in his reasons for judgment “there is no evidence that this particular student knew she could ride the bus.” (Emphasis added.) When the school chose to institute a policy contrary to the statutory requirement of free transportation it assumed a high burden of responsibility to ensure that any child denied such transportation has an alternate safe means of getting home.
BREACH OF DUTY
The Board’s reliance on a recorded message call, to the child’s home telephone, with no assurance that the call was received by an adult, i.e. parent, does not discharge this duty. The defense further offered testimony to establish C.C. was afforded the opportunity to make a telephone call to her mother. Though it is unnecessary in the end for us to resolve any conflict in the testimony, we take brief | (¡liberty to make the following observations. A careful review of the testimony of witnesses called by the school board discloses that none of these witnesses can directly contradict C.C.’s testimony that the office door was locked when she attempted to open it to use the phone. Despite Brenda Billedeaux’s insistence that C.C. and other students used the phone in the office on November 4, 2004, after Behavior Clinic class, she actually had no first hand observation or knowledge of this alleged fact. Mrs. Billedeaux testified she was standing on the front porch of the school as the kids were coming in and out of the building “using the phone, maybe getting water or for whatever reason.” She also admitted she had no independent knowledge as to whether C.C. tried to use the office phone or whether the office door was locked when C.C. attempted to enter the office. Mrs. Reed, C.C.’s Behavior Clinic teacher, also testified she knew the students used the office phone that afternoon but stated she walked past the office and waited out front. She, too could not testify to any direct observation of any student using the office phone that day. Additionally, she also testified she had no way of knowing whether or not C.C. tried to get into the office and whether the doors were locked at such time. Mr. Christopher Ferrill, a teacher working in the copy room near the office also could not actually substantiate whether C.C. tried to use the office phone or whether the doors were locked when C.C. tried to get into the office. Close scrutiny of his testimony reveals that the room he was in is about 16 feet around the corner from the principal’s office and allows for view of only a section of the principal’s office. Moreover, he also testified he left the copy room area at about 3:50 P.M., which was before Behavior Clinic dismissed.
Neither Mr. Pollan nor Mrs. McGee were present at school on November 4, 2004, but both offered testimony that as a general rule the office is open so long as |7the building is open. Additionally, although one teacher testified she expressly *620 recalled the identity of one student who she says told her he had to call home again because he forgot to tell his mom something the first time, that alleged student was not called as a witness.[4]
As Justice Johnson noted in her earlier review, the School Board’s witnesses’ testimony concerning whether C.C. tried to call home and whether the office door was locked when C.C. tried to enter the office to use a telephone, are not based on personal knowledge but are based on speculation relying largely on general policies. It is just as reasonable to surmise from their testimony as a whole, and C.C.’s account, that when C.C. approached the office the doors were closed. When questioned on cross examination by defense counsel, C.C. clearly equates “closed” with locked. No attempt by either defense or plaintiffs counsel was made to explore exactly what C.C. did to assure that the office doors were, in fact, locked. It is just as reasonable to find, based on C.C.’s testimony examined in whole, that she saw the doors closed and believed the doors were locked.[5]
The heightened duty imposed on the Board again requires more than an assumption by school officials that the office telephone is accessible to a Behavior Clinic student held after hours to call home for a ride. This young student was only 12 years old. By Mrs. Reed’s own admission, “children will be children and you lose | sthem.”
As Justice Johnson noted:
This case is more akin to D.C. v. St. Landry Parish School Board, 00-01304 (La.App.3 Cir.3/7/01), 802 So.2d 19, writ denied, 01-981 (La.5/25/01), 793 So.2d 169, where the court held that the scope of a school board’s duty encompassed the foreseeable risk that a female student who left school campus and walked through a bad neighborhood might fall victim to one of the criminals that frequented such an area.
S.J., 959 So.2d at 888.
Justice Johnson further distinguished this court’s decision in Frederick v. Vermilion Parish School Board, 00-382 (La.App. 3 Cir.10/18/00), 772 So.2d 208 finding the Frederick decision was inapplicable to this case because that case involved older students able to make decisions independent of their parent’s authority whereas “C.C. was a twelve year old middle school student.” Supra., at 887-888.[6]
*621 Further, the fact that a bus was present on campus and an exception allegedly would have been made if requested is one that does not negate the Board’s duty and obligation to inform C.C. that it was permissible to board the bus. C.C. did not know to ask to ride the bus. The trial judge clearly erred in finding that bus transportation was available but C.C. chose not to use that transportation. The trial judge’s own written reasons for judgment, as well as the evidence, contradict his statement that “the evidence is overwhelming that transportation was available through bus service.” The trial judge specifically stated: “I note that there is a confusing system relating to bus use by students in behavioral clinic, and there is no evidence that this ^particular student knew she could ride the bus.” (Emphasis added.)
Justice Johnson again correctly set forth the school board’s duty, in part relying on the previous decision of this court in Gary On Behalf of Gary v. Meche, 93-271 (La.App. 3 Cir.11/3/93), 626 So.2d 901:
A school board, through its agents and teachers, owes a duty of reasonable supervision over students. LSA-C.C. art. 2320; Wallmuth v. Rapides Parish School Bd., 2001-1779 (La.4/3/02), 813 So.2d 341, 164 Ed. Law Rep. 511; Adams v. Caddo Parish School Bd., 25,-370 (La.App. 2 Cir. 1/19/94), 631 So.2d 70, writ denied, 94-684 (La.4/29/94), 637 So.2d 466. The supervision required is reasonable. Competent supervision must be appropriate to the age of the children, and the attendant circumstances. Jackson [v. Colvin, 98-182 (La.App. 3 Cir.12/23/98), 732 So.2d 530], supra. This duty does not make the school board the insurer of the safety of the children, and constant supervision of students is not required for educators to discharge their duty to provide adequate supervision. Adams, supra. [In] (sic) Comeaux v. Commercial Union Ins. Co., 269 So.2d 500 (La.App. 4th Cir.1972), the appellate court stated that, “Reasonable, competent supervision commensurate with the age of the child and the attendant circumstances.” Id., at 502. [In] (sic) Gary On Behalf of Gary v. Meche, 626 So.2d 901 (La.App. 3 Cir.1993), the court held that “a school board’s duty to reasonably supervise young students is not restricted to school hours, and that school boards must have a policy to ensure that young children do not leave the school unattended.” (Emphasis added.)
S.J., 959 So.2d at 886.
In addressing breach of duty, Justice Johnson further correctly explained:
Generally, breach of a duty is the failure to exercise reasonable care under the circumstances. Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law Sect. 6-1, at 139 (1996). The duty of reasonable supervision is generally always present when a child is on campus during regular school hours, is waiting on the school’s ground for a school bus, or is participating in an after school sanctioned activity such as band rehearsal or sport related practices. (Emphasis added.)
S.J., 959 So.2d at 886.
Simply put, the school board failed to meet its duty of supervision owed to C.C. under the circumstances.
*622 |u,DAMAGES
C.C. and her mother testified C.C. was greatly affected by the rape. Her grades dropped, she was scared to go outside, and when she did go outside she would hear things and was afraid. C.C. developed feelings of self loathing and felt no one loved her. She would come home from school crying every day. The children at school harassed and teased her telling her she was pregnant and asking if she enjoyed what happened to her. She felt even the faculty did not treat her much better. C.C. had to move schools twice after the rape. This court has clearly held that sexual molestation of a minor child always results in harm to the child and damages are presumed. In Doe v. Mires, 99-65, p. 5 (La.App. 3 Cir.6/2/99) 741 So.2d 842, 845, quoting Smith v. Perkins, 94-1270, pp. 8-9 (La.App. 4 Cir. 12/28/94), 648 So.2d 482, 486, writ denied, 95-267 (La.3/24/95), 651 So.2d 292 we held: “The sexual molestation of a child is certainly a deliberate and intentional act, and the emotional and physical damage is such a fundamental and natural consequence of the molestation that any predator must be held to realize that damage will result.” Defendant offered no evidence to refute C.C. and her mother’s testimony in this regard.
The only medical bill introduced into evidence is the bill for Acadian Ambulance totaling $345.64. Although medical records from Lafayette General Medical Center were introduced as evidence, no billing records were introduced and there is no information provided as to the cost of C.C.’s medical care either through testimony or record evidence. Although Plaintiffs are entitled to recover medical costs, such an award can only be based upon evidence of record. Therefore, based on the evidence introduced at trial, Plaintiffs are entitled to an award of $345.64 in special damages. As to general damages, we award C.C. general damages in the amount of $100,000.00, and we award S.J. $20,000.00 general damages, under the Inprovisions of La.Civ.Code art. 2315.6. However, we are required to assess the comparative fault of all responsible parties in causing harm to C.C. and her mother. In doing so, as statutorily mandated, we assign the actual perpetrator of the crime 75% fault and C.C. 5% fault. We assign 20% fault to the Lafayette Parish School Board. Accordingly, judgment is hereby rendered in Plaintiffs’ favor against the Lafayette Parish School Board in the proportionate amounts equal to the fault herein assigned. All costs of court and all costs of this appeal are assessed against Defendant, Lafayette Parish School Board.
REVERSED AND RENDERED
COOKS, J, concurs in result and assigns reasons.
SAUNDERS, J. concurs in the result and assigns written reasons.
GREMILLION, S. concurs and assigns written reasons.
PETERS, J., dissents and assigns written reasons.
THIBODEAUX, Chief Judge, dissents for the reasons assigned by Judge PETERS and for additional reasons.

. C.C. only had a glass of water at Popeyes as she had no money.

. Other than attempts by counsel, in brief and at oral argument, to cast doubt on the child's account of the incident, the physical evidence, i.e., semen on her person, adds scientific credibility to her version of the event and a finding that she was sexually molested by a male, an act our criminal statute defines as aggravated rape. La.R.S. 14:42.

. The defense focused during oral argument on a map it introduced and directed our attention to a possible alternate route the child could have taken to her home. There is nothing, however, in the record suggesting that the child knew the route defense counsel goo-gled off the internet long after the incident and there is no indication in the record that any school official advised the child to take the alternate path. Moreover, this child had never walked home from school before and her choice to walk along the well lit and well traveled street in front of the school house en route to her home seems reasonable.

. We note as well a close examination of S.R.C.'s testimony reveals she and C.C. did not leave Behavior Class together that day nor did they leave the school building together that day. S.R.C. could not say whether the office was open when C.C. approached the office sometime after S.R.C. had passed the office. According to S.R.C. she and C.C. met up in front of the school at the corner of the sidewalk and C.C. asked her where was she going. Although the Board argues that the girls devised a plan earlier that day to walk home from school there is no evidence in the record to support his position.

. The defense points out that one witness testified C.C. allegedly admitted to her on tape that she had not asked Mrs. Reed to use her cell phone, but the alleged tape recording was not produced at trial although the witness testified that it was in the custody of defense counsel. It is well settled that evidence in the custody and control of a party which it does not introduce at trial raises a presumption that the evidence would not be favorable to its case.

. There were only two dissents on the decision to remand the case for full trial on the merit. Justice Victory expressed no dissenting reasons. Justice Knoll dissented because she believed the bare-bone affidavits filed by defendant was insufficient to refute the School Board's allegation that bus transportation was available. We know now that the facts are undisputed that bus transportation was not provided to C.C. after Behavior Clinic. In fact, the testimony established on November 4, 2004 an announcement was made over the school intercom reminding students *621 and C.C. dial Behavior Clinic students were not allowed to ride the bus. Although Justice Weimer’s concurrence hinged on the accessa-bility of a telephone to C.C., it is clear now that he too may revisit this issue and find the Board did not satisfy its duty by providing bus transportation, a duty he viewed as paramount in his initial review.