*1121 GUIDRY, Justice.*
| Gn this case, we are called upon to determine whether the Lafayette Parish School Board breached its duty of reasonable supervision over its students when a twelve-year-old sixth-grader left the school grounds to walk home and was allegedly sexually attacked along the way. The student, who had attended an obligatory, after-school behavior modification class, alleged she was forced to walk home through a known high crime area because she was not allowed to ride the after-hours school bus and was further denied access to a telephone to arrange transportation home. The district court found no negligence on the part of the defendants because the student had been allowed access to a telephone and there were other modes of transportation available to her. The court of appeal in a plurality decision reversed, finding the School Board had breached its duty to the student and was therefore liable for the student’s injuries, assigning fault of 20% to the School Board, and awarding general damages of $100,000 to the student and $20,000 to her mother. For the reasons that follow, we find the court of appeal majority erred in reversing the trial court’s judgment. Because the trial court committed no legal error with regard to the duty owed by the School Board and because there was no manifest error in the trial court’s |2factual findings of no breach of that duty, we reverse the court of appeal decision and reinstate the judgment of the trial court in favor of the defendants.
FACTS AND PROCEDURE
During the 2004-2005 school term, the Lafayette Middle School operated both a tutoring program and a disciplinary program after school on Tuesdays and Thursdays. C.C., a twelve-year-old sixth-grade student, had participated previously in both the tutoring program and the disciplinary program known as the Behavior Clinic, the former more often than the latter. Both programs began immediately after the end of the school day and lasted until around 4:00 p.m. The Lafayette Middle School provided a full-sized school bus to take the tutoring program children home, as well as students who had remained after school for other voluntary school-sanctioned programs, but, as a general rule, the Behavior Clinic children were instructed that they could not ride this “late bus” or “tutoring bus.” C.C. testified she was told by the principal during the day that Behavior Clinic participants would not be permitted to take the “tutoring bus.” Instead, apparently to emphasize the disciplinary aspect of the program, participants were required to make transportation arrangements in advance of their Behavior Clinic participation or immediately after the Behavior Clinic.
On Tuesday, November 4, 2004, C.C. participated in the Behavior Clinic.[1] Although she knew she would be required to participate that afternoon, she made no mention of participation to her mother, S.J., as she left home that morning. Previously, her mother had received notification of C.C.’s participation in the Behavior Clinic by automated telephone call on two occasions that school year and |shad made *1122 arrangements to pick up her daughter on each occasion. C.C. testified the school “would always call” the night before and tell her mother that C.C. had Behavior Clinic. S.J. confirmed that she had received a recorded message from the principal on those earlier occasions. Additionally, C.C. testified that on the two prior occasions she had also called her mother using a friend’s cell phone to tell her mother to come pick her up after Behavior Clinic; however, S.J. denied C.C. had called her on those occasions. C.C. did not telephone her mother on November 4, 2004, even when she was reminded about Behavior Clinic that afternoon, nor did she make any effort to do so. On the afternoon of November 4, 2004, S.J. did not pick up her daughter, nor did she make arrangements for her daughter to be picked up by a responsible party. C.C. testified that the doors to the principal’s office where the telephone was located were closed or locked and that Ms. Gladys Marie Reed, a teacher employed by the School Board and a supervisor of the Behavior Clinic, had refused to let C.C. use Ms. Reed’s cell phone to call her mother. Ms. Reed denied she was ever asked by C.C. to use Ms. Reed’s cell phone. S.J. testified she did not receive notice of C.C.’s participation in the Behavior Clinic.
After Behavior Clinic ended, C.C. left the campus with a fellow student, S.R.C., and walked to a nearby fast food restaurant. C.C. testified that, during Behavior Clinic, she had decided to accompany S.R.C. to the fast food restaurant, and from there S.R.C. would take a city bus home. S.R.C. left C.C. at the restaurant and boarded a city bus to travel to her home. Sometime thereafter, while she was walking home, C.C. had a sexual encounter with an unknown male, and reported to her mother, and eventually to the police, that she had been raped.
Claiming that C.C. was denied a ride home in the after-hours school bus and further denied access to a telephone to call her mother to arrange transportation, and |4was thus forced to walk home through a known high crime area, S.J., individually and on behalf of her minor daughter, C.C., filed suit against the Lafayette Parish School Board and Ms. Reed, claiming the defendants were negligent for their failure to exercise adequate and/or reasonable supervision over C.C. while she attended a school-sanctioned activity.
The defendants denied liability and filed a motion for summary judgment pursuant to La.Code Civ. Proc. art. 966, asserting the plaintiffs could not establish a duty or breach of duty by the defendants. Finding the School Board had no duty to safeguard a child’s well-being after the child leaves the school property, the trial court granted summary judgment in favor of the defendants. The court of appeal affirmed in an unpublished opinion. By a per cu-riam decision, this court reversed the grant of summary judgment and remanded the matter for further proceedings. S.J. v. Lafayette Parish School Board, 06-2862 (La.6/29/07), 959 So.2d 884.
Following a bench trial on remand, the district court found no negligence on the part of the defendants and dismissed the plaintiffs’ claims. After noting the School Board’s duty to students after school hours is “clear,” and without reaching the question of whether the alleged harm suffered by C.C. was reasonably foreseeable, the trial court found that the plaintiffs had failed to carry their burden of proving negligence on the part of the School Board.[2] The trial court found the evidence *1123 “overwhelming that transportation was available through bus service, and the use of a telephone was made available to the juvenile on the day in question.” This was logical, the court explained, because the school employees conducting activities on campus cannot leave until all students have the left the school premises. | s“To a person,” the court stated, “they all testified that no child is left behind, even if they have to pay for bus service or provide a ride.” The trial court observed that preventing a student from using the telephone to call for a ride would have extended the employee’s workday unnecessarily, and that other students had confirmed the telephone could be accessed.
With regard to the “system relating to bus use by students in behavioral clinic” the trial court found it to be “confusing,” and further found “there was no evidence that this particular student knew she could ride the bus.” Nevertheless, the trial court found no breach of the School Board’s duty to C.C. under these circumstances. The trial court reasoned that C.C. testified her intent was to call her mother, rather than to ride the bus home, and C.C. was not denied telephone access. Having found no breach of the School Board’s duty, the trial court dismissed the plaintiffs’ suit.[3]
A three-judge majority of a five-judge panel of the court of appeal reversed, and found liability on the part of the School Board. S.J. v. Lafayette Parish School Board, 08-900 (La.App. 3 Cir. 7/29/09), 16 So.3d 615. That decision, in six parts, consisted of (1) the lead opinion authored by one member of the three-judge majority, (2) an opinion concurring in the result from a second member of that majority, (3) another opinion concurring in the result from the third member of the majority, (4) additional concurring reasons from the author of the lead opinion, (5) a dissenting opinion, and (6) a second dissenting opinion in which the dissenting judge joined the first dissenting opinion and gave additional reasons. The lead opinion found the School Board to be 20% at fault, the juvenile to be 5% at fault, and the unknown perpetrator to be 75% at fault. The lead opinion awarded $345.64 in special damages, |6$100,000 to C.C. in general damages, and $20,000 to S.J. in general damages under La.Code Civ. art. 2315.6.
In sum, two members of the majority finding liability on the School Board found the School Board had a “heightened” statutory duty under La.Rev.Stat. 17:158(A)(1) to provide free transportation to C.C. because she lived more than one mile away from the school. See S.J. v. Lafayette Parish School Bd., 08-900, p. 7, 16 So.3d at 620 (lead opinion per J. Cooks), and 16 So.3d at 624 (Saunders, J., concurring). The lead opinion found the School Board had beached that duty by denying C.C. transportation on the after hours bus and denying her access to the telephone — noting “it was just as reasonable” to find that the doors were closed when C.C. approached the principal’s office and that C.C. believed the doors were locked. The lead opinion further found the plaintiffs had suffered damages as a result of the rape. In her additional concurring opinion, the author of the lead opinion found C.C. was statutorily entitled to a free ride home under La.Rev.Stat. 17:158(A)(1) re *1124 gardless whether she was in behavior clinic or tutoring clinic. S.J., 16 So.3d at 623 (Cooks, J., additionally concurring). Further, she found a causal relation between the school personnel’s conduct in unlawfully denying C.C. free bus transportation home from school, along with the school’s breach of its duty to supervise her and to make sure she had secured a safe alternate means home, and the risk of harm that forcing C.C. to walk home through a notoriously dangerous area had created. Id. The first concurring opinion found that the harm suffered by C.C. was reasonably foreseeable within the scope of the School Board’s duty to provide free transportation under La.Rev.Stat. 17:158(A)(1) and that the School Board’s conduct in breaching this duty was a cause-in-fact of the harm suffered. S.J., 16 So.3d at 624 (Saunders, J., concurring).
|7The second concurring opinion disagreed that La.Rev.Stat. 17:158(A)(1) expands the scope of the duty required of the School Board. S.J. v. Lafayette Parish School Bd., 16 So.3d at 625 (Gremillion, J., concurring). However, the concurrence found the School Board had breached its duty of reasonable supervision by intentionally withholding a safe and convenient ride home as a means of punishing bad behavior. Within the School Board’s general duty of reasonable supervision, the concurrence reasoned, there is a specific duty to make appropriate supervisory decisions concerning a student’s departure from campus. Id., 16 So.3d at 626 (Gremillion, J., concurring) (citing D.C. v. St. Landry Parish School Bd., 00-1304 (La. App. 3 Cir. 3/7/01), 802 So.2d 19, unit denied, 01-981 (La.5/25/01), 793 So.2d 169). The concurrence found that the School Board’s “exceedingly bad ‘departure decision’ ” placed C.C. in the position of having to walk home through a dangerous neighborhood wherein she was attacked. Id., 16 So.3d at 627.
The first dissenting opinion believed the majority awarding damages had erred in applying the manifest error standard of review and the duty-risk analysis. S.J., 16 So.3d at 627 (Peters, J., dissenting). The dissent further disagreed that La.Rev.Stat. 17:158(A)(1) expands the scope of the School Board’s duty beyond that of reasonable supervision set forth in Wallmuth v. Rapides Parish Sch. Bd., 01-1779, 01-1780, p. 8 (La.4/3/02), 813 So.2d 341, 346. The dissent believed that such an expanded duty would result in making a school board the insurer of the safety of every child, overruling Wallmuth and its progeny. S.J., 16 So.3d at 630. After reviewing the record in depth, the dissent found no manifest error in the trial court’s factual finding that the School Board had not breached its duty of reasonable supervision. The dissent concluded the record evidence supported the trial court’s factual finding that C.C. was not denied access to a telephone. Id., 16 So.3d at 633-34. The dissent 18further concluded the record evidence supported the trial court’s factual finding that there was city bus service and alternate means of arriving home safely available to C.C. The dissent concluded that the school had followed its policy of making sure that no child would be left on campus by having telephone access, by making available other means of transportation, and by providing an on-campus procedure to make sure that everyone has left campus before locking it down. Id., 16 So.3d at 637. Thus, the dissent believed the trial court’s factual finding that the School Board did not breach its duty of reasonable supervision was supported by the record. The dissent went on to conclude the plaintiffs failed to prove that any breach of the School Board’s duty was a cause-in-fact of their injuries or that C.C. was sexually assaulted, as the trial court similarly indicated, including the nature of *1125 the actual sexual encounter. Id., 16 So.3d at 640.
We granted the School Board’s writ application to assess the correctness of the plurality ruling below. S.J. v. Lafayette Parish School Bd., 09-2195 (La.2/5/10), 27 So.3d 287. For the reasons set forth below, we reverse the court of appeal decision and reinstate the judgment of the district court.
APPLICABLE LAW
Louisiana courts have adopted a duty-risk analysis in determining whether liability exists under the facts of a particular case. Brewer v. J.B. Hunt Transport, Inc., 09-1408 (La.3/16/10), 35 So.3d 230. Under this analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries; (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries; and (5) actual damages. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217, p. 6 (La.4/3/02), 816 So.2d 270, 275-76. Whether a duty is owed is a question of law; whether a defendant has breached a duty owed is a question of fact. Mundy v. Department of Health and Human Resources, 620 So.2d 811, 813 (La.1993).
Duty of the School Board
Given this legal framework, our first task under the duty-risk analysis in this case is to determine the duty, if any, which the defendant School Board owed to the plaintiffs. Whether under La. Civ. Code art. 2315 or La. Civ.Code art. 2320, it is well-settled that the duty imposed on a school board with regard to children in its care is one of “reasonable supervision.” Wallmuth v. Rapides Parish School Bd., 01-1779, 01-1780, p. 8 (La.4/3/02), 813 So.2d 341, 346. In Wallmuth, we endorsed the applicable standard of liability as follows:
A school board, through its agents and teachers, owes a duty of reasonable supervision over students. The supervision required is reasonable, competent supervision appropriate to the age of the children and the attendant circumstances. This duty does not make the school board the insurer of the safety of the children. Constant supervision of all students is not possible nor required for educators to discharge their duty to provide adequate supervision.
Before liability can be imposed upon a school board for failure to adequately supervise the safety of students, there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident.... Furthermore, before a school board can be found to have breached the duty to adequately supervise the safety of students, the risk of unreasonable injury must be foreseeable, constructively or actually known, and preventable if a requisite degree of supervision had been exercised.
Id., p. 8, 813 So.2d at 346 (citations omitted).
Although the nature and scope of a school board’s duty over students in its custody is long-established, the plurality opinion below found that La.Rev.Stat. 17:158(A)(1) provided for a heightened duty to a student who lives more than a mile hpiromL the school.[4] The plaintiffs *1126 similarly argue in this court that the school was legally obligated to provide C.C. a ride home under the statute, and that its policy of refusing to allow Behavior Clinic students to ride the after hours bus violated this obligation. La.Rev.Stat. 17:158(A)(1) provides:
Except as provided by Subsection H of this Section and in accordance with the requirements of Subsection F of this Section, each parish and city school board shall provide free transportation for any student attending a school of suitable grade approved by the State Board of Elementary and Secondary Education within the jurisdictional boundaries of the parish or school board if the student resides more than one mile from such school.
We do not read this statute as expanding the scope of a school board’s duty of reasonable supervision owed to students within its care. Although the statute mandates free transportation be provided to students who live more than one mile from school, to adopt a holding as proposed by the plaintiffs and two judges below is to make a school board responsible for any and all injuries sustained by “any student,” regardless of time, distance, and intervening factors, when those injuries would not have been suffered if the student had just been provided a free ride home.[5] As one concurring judge noted below, this is not the law in Louisiana. S.J., 16 So.3d at 626 (Gremillion, J., concurring). As we explained in Wallmuth, p. 8, 813 So.2d at | n346, the school board is not the insurer of the safety of the children, and constant supervision of all students is neither possible nor required. The statute provides for a penalty for violation of the requirement of free transportation rather than for an action in tort. See La.Rev.Stat. 17:158(C). We have held that the violation of a statute gives rise to civil liability only when “the prohibition in the statute is designed to protect from the harm or damage which ensues from its violation.” Laird v. Travelers Ins. Co., 263 La. 199, 267 So.2d 714, 717 (1972). La.Rev.Stat. 17:158 is an accommodation statute, not a safety statute, as the dissenting judge pointed out below. We agree the statute is not designed to prevent the injury or assault of students when they leave the school; rather, it is designed only to provide free transportation for schoolchildren who live more than a mile away from the school. “Louisiana has a long-standing recognition of the right of elementary and secondary students and their parents to a free education and that included within that concept is the right to free transportation to and from school.” Moreau v. Avoyelles Parish School Bd., 04-1613, p. 4 (La.App. 3 Cir. *1127 3/9/05), 897 So.2d 875, 880, units denied, 05-910 (La.6/17/05), 904 So.2d 704 and 05-997 (La.6/17/05), 904 So.2d 705.
The general rule has been that allowing a student to leave the campus during regular school hours in violation of the school’s established policy is a violation of the duty of reasonable supervision. Peters v. Allen Parish School Bd., 08-323 (La. App. 3 Cir. 11/5/08), 996 So.2d 1230, D.C. v. St. Landry Parish School Bd., 00-1304 p. 6, 802 So.2d at 23. For example, some courts have held that the duty of reasonable supervision encompasses preventing a six-year-old from leaving the school grounds unattended at the end of the school day. See Sutton v. Duplessis, 584 So.2d 362 (La.App. 4th Cir.1991); Gary on Behalf of Gary v. Meche, 626 So.2d 901 (La.App. 3rd Cir.1993). However, the extent of the duty of reasonable supervision depends on the 112age of the student. In Jackson v. Colvin, the court held that a school board is not required to ensure that a nine-year-old student who is walking-home after an extracurricular activity does not leave the school grounds alone. Jackson v. Colvin, 98-182 (La.App. 3 Cir. 12/23/98), 732 So.2d 530, writ denied, 99-228 (La.3/19/99), 740 So.2d 117. In Domingue v. Lafayette Parish School Bd., the court held the school board did not breach its duty of reasonable supervision to an eleven-year-old sixth grade student, who had been instructed by his mother to ride the bus home from school, but who instead decided to walk home from school and was struck by a vehicle. Domingue v. Lafayette Parish School Bd., 03-895 (La. App. 3 Cir. 6/16/04), 879 So.2d 288, writ denied, 04-1803 (La.10/29/04), 885 So.2d 588. Therefore, the duty we must analyze in this matter is whether the School Board provided reasonable supervision to C.C. in accordance with her age and the accompanying circumstances.
Manifest Error — Clearly Wrong-Standard of Review
In Louisiana, appellate courts review both law and facts. La. Const, art. 5, § 10(B). The applicable standard of review for a factual finding is the manifestly erroneous or clearly wrong standard. To reverse a factfinder’s determination under this standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine the record establishes the finding is clearly wrong. Stobart v. State, Dep’t of Transp. and Development, 617 So.2d 880, 882 (La. 1993). Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Id. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would | ishave weighed the evidence differently. Id. at 882-883. Accordingly, where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. Id. at 883.
Nonetheless, where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness’s story, a reviewing court may well find manifest error. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989). Where such factors are not present, however, and a factfinder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can *1128 virtually never be manifestly erroneous or clearly wrong. Id.
Additionally, “[i]n applying the manifestly erroneous — clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.” Rosell v. ESCO, 549 So.2d at 844. The credibility determinations of the trier of fact are subject to the strictest deference under the manifest error — clearly wrong standard. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305. An independent de novo review by the appellate court is proper only “[w]here one or more trial court legal errors interdict the fact-finding process” and “the record is otherwise complete.” Ferrell v. Fireman’s Fund Ins. Co., 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747.
ANALYSIS
The School Board argues the record supports the trial court’s factual finding that the plaintiffs failed to prove by a preponderance of the evidence the School Board negligently breached its duty of care to C.C. The plaintiffs counter that the trial court’s factual findings are manifestly erroneous and, thus, the appellate court was justified in performing a de novo review of the record. In that regard, the | uplaintiffs argue the evidence establishes the School Board breached its duty to C.C., as well as its obligation under La. Rev.Stat. 17:158, by failing to put in place a policy or practice regarding the safe departure of students from school sufficient to insure that students, especially those living more than a mile from school, had a safe way home following behavior clinic. The plaintiffs contend the record proves that a bus was not available to C.C. and that she was denied access to a telephone to arrange alternate transportation, thereby forcing her to walk home from school through a known dangerous area of the city.
We can detect no legal error in the trial court’s reasoning that would require de novo review of the record, and the lower court majority does not specify it so found. As discussed above, we find no expanded or heightened degree of reasonable supervision was owed to C.C. by virtue of La. Rev.Stat. 17:158. Accordingly, we turn to whether the trial court manifestly erred in finding that plaintiffs failed to prove a breach of the School Board’s duty of reasonable supervision owed to C.C. in proportion to her age and the accompanying-circumstances. We find, as set forth below, that the record evidence supports the trial court’s credibility determinations and factual conclusions that C.C. was not denied access to a telephone and that, though there were other alternative modes of transportation available to her, C.C. never intended to take the after hours bus, and failed to avail herself of those alternatives.
Telephone Access
As noted previously, the plaintiffs’ theory for the School Board’s liability is premised in part on the assertion that C.C. was unable to use the school telephone in the principal’s office to call home because the door to the office was locked, and that Gladys Marie Reed, the Behavior Clinic supervising teacher, denied C.C.’s | ^subsequent request to use Ms. Reed’s personal cell phone to call home. In its reasons for judgment, the trial court concluded “[t]he evidence is overwhelming that ... the use of a telephone was made available to the juvenile on the day in question.” The trial court further concluded the “[sjtudents were also questioned and confirmed the phone could be accessed.” In reaching these factual conclusions, the trial court clearly made credibility determinations on the issue of telephone availability, as evidenced by the trial *1129 court’s own questioning of C.C. and other witnesses, and resolved this issue in favor of the School Board. The record supports that conclusion.
C.C. testified that immediately after the Behavior Clinic, she went to the principal’s office on the first floor of the school to telephone her mother, but when she reached the office, she found the office door locked. According to C.C., she returned to the Behavior Clinic room, which is located on the third floor of the school, to ask Ms. Reed for the use of Ms. Reed’s cell phone to call her mother. She testified that after Ms. Reed refused to allow her to use the phone, she went outside and met with her friend, S.R.C. Although the tutoring student school bus was still in front of the school, she walked with S.R.C. to a nearby fast food restaurant.
C.C.’s testimony was the only evidence presented by the plaintiffs on the issue of the availability of a telephone, and they assert her testimony was not contradicted. However, there was ample evidence that a telephone was available to the Behavior Clinic students. Moreover, the suggestion by the plaintiffs and in the lead opinion below that C.C. reasonably believed the doors were locked simply because they were closed is belied by her own testimony, in which she unequivocally stated she physically checked the doors and found them locked.
The School Board called a number of witnesses who disputed C.C.’s version of the facts on the issue of the locked doors and telephone access. Ms. Reed testified 11fithat at the end of each Behavior Clinic session, she requires all the participating students to properly stack the material they have been working on, instructs them to exit the building but not to use the bathroom or get water, and instructs them to use the telephone in the office immediately before leaving the building if needed. According to Ms. Reed, the principal’s office is open after dismissal of the Behavior Clinic to accommodate those students who must make arrangements for transportation. She affirmatively testified the office was open on November 4, 2004, stating that, as she left the building, she observed several children using the telephone in the principal’s office. When she left the premises approximately ten minutes later, the tutoring bus was still parked in front of the school and there were still children waiting for rides. However, she did not see C.C.
Ms. Reed specifically denied C.C. ever asked to use her cell phone, and testified that, had C.C. asked, she would certainly have allowed her to telephone her mother. In fact, according to Ms. Reed, a few days after this incident, C.C. apologized for having lied to others about Ms. Reed’s alleged denial of the use of her cell phone.
Christopher Ferrill testified that after school on November 4, 2004, he made a number of copies at the office near the principal’s office and observed that the principal’s office was open. In fact, during that afternoon, he had used the office telephone to call his wife and was around the office when the tutoring and Behavior Clinic classes ended. Additionally, he testified the office is always open until the janitors lock the building after everyone has left.[6]
*1130 | l7Monique Boute McGee, the Assistant Principal at Lafayette Middle School, testified C.C. came to her two days after the incident at issue and told her that she never asked Ms. Reed for the use of her cell phone. Ms. McGee is the person who called Ms. Reed in to accept C.C.’s apology. Although Ms. McGee was not present at school after 3:00 p.m. on November 4, 2004, she testified that the principal’s office is open every day until the janitor locks up, and that the telephone is available to the students staying after school. On November 5, 2004, after hearing of the alleged attack on C.C., Ms. McGee questioned a number of the Behavior Clinic students who were present the day before and found no complaints concerning the use of the telephone.
Brenda Faye Billedeaux, the Behavior Discipline Center facilitator, testified that on November 4, 2004, the Behavior Clinic ended at 4:00 p.m. and the tutoring sessions ended at 4:15 p.m. At approximately 3:55 p.m., Ms. Billedeaux went through the principal’s office and made an afternoon announcement, then left through the front door to the office to ensure that the door was propped open and the phone on the counter. She subsequently observed a number of students using the telephone. On that day, she was on the campus until 4:35 p.m., waiting for another student to be picked up.
Ronald Pollan, the Principal at Lafayette Middle School, testified that it is school policy for the office to remain open in the afternoon after school to allow children stranded on campus to telephone for transportation. While he was not present on the afternoon of November 4, 2004, he conducted interviews with other students on November 5, 2004, and found no evidence to suggest that the policy was not followed on the day before.
Randy Fitzgerald Andrus, the custodian on duty on November 4, 2004, testified Uthat he generally remains on campus from 9:00 a.m. until 6:00 p.m., he checks the building to make sure everyone has left, he then locks the office and the building, and he is the last to leave each day. According to Mr. Andrus, this procedure was in effect on November 4, 2004, and the office was open that afternoon after school until he left for the day.
S.R.C. acknowledged in her testimony that Ms. Reed dismissed the class just as Ms. Reed had explained in her testimony. S.R.C. specifically remembered Ms. Reed instructing any student who needed to call a parent to go directly to the office. She recalled the door to the office being open, the school secretary being present in the office, and other students using the office telephone.
Aside from the author of the lead opinion, the remaining four members of the panel below found no manifest error in the trial court’s finding that C.C. had had access to the principal’s office and a telephone, with which to call her mother to arrange transportation home. Based on the record, we similarly detect no manifest error in the trial court’s conclusion.
Alternative Modes of Transportation
In its reasons for judgment, the trial court factually concluded that “[t]he evidence is overwhelming that transportation was available through bus service.” The majority finding liability below, as do the plaintiffs here, maintain that, because C.C. could not ride the tutoring student bus, the School Board failed to provide transportation and breached its duty to do so. There is no evidence, as the trial court found, that C.C. was informed she could use the after hours bus even though she was a Behavior Clinic student; indeed, it is clear that she was informed she could not do so. However, we agree with the trial *1131 court that other modes of transportation were available to C.C., but that she failed to avail herself of them, and had no intention of | t9doing so. Although everyone can agree that Lafayette Middle School’s policy concerning the use of the “tutoring bus” was not only “confusing,” as the trial court noted, but also “ill conceived,” as the dissent below suggested, we do not find the School Board breached its duty of supervision to C.C. under these circumstances. The record clearly establishes the school had in place a policy or practice to ensure that no child would have been left at the school had C.C. remained at the school rather than accompany S.R.C. to the fast food restaurant and walk home thereafter.
Ms. Billedeaux, who had devised the bus use policy, claimed it was put in place to guarantee the tutoring students a ride home, but not to totally deny the Behavior Clinic participants a ride. She testified that, after all tutoring students were accommodated, the remaining space on the bus was provided to the Behavior Clinic students. However, she acknowledged that the policy was not articulated to the students in that fashion, and that an announcement was made to the effect that Behavior Clinic students were not allowed to ride the bus. In language often quoted by the plaintiffs, Ms. Billedeaux indicated that part of the intent of the stated policy was to make it plain to the Behavior Clinic students that she was not obligated to find them the “luxury of a free ride home” and, thus, transportation difficulties would be a part of their punishment for breaking the rules.
There was, however, other testimony regarding the school’s policy that no child was left behind or denied assistance in getting home. Ms. Reed testified that any transportation problem would always be addressed, and that she had driven children home in the past. Additionally, she made it clear that a teacher is always present until every student has left the campus. Mr. Ferrill testified that he had helped children find transportation in the past, and had driven some home as well. Ms. McGee was not even aware of the problem with the “tutoring bus” and made it clear that children [ 2f)would be accommodated. Ms. Billedeaux, too, testified she personally had taken children home. Mr. Pollan confirmed the testimony of the other teachers, and both he and Ms. Bille-deaux testified that, because C.C. was a regular tutoring student she had the right to ride the tutoring student bus even though she was attending the Behavior Clinic rather than tutoring class on November 4, 2004. According to Mr. Pollan, a student is never left stranded on campus.
The testimony of Peter A. Arceneaux, the driver of the “tutoring bus,” supported the stated school policy that, when space is available, no Behavior Clinic student would be denied a ride on his bus. According to Mr. Arceneaux, the only thing the school wished to do with its stated denial policy was to require the Behavior Clinic students to attempt to contact their parents first. If that failed, the bus was available. Mr. Arceneaux testified that space was available on November 4, 2004.
As the trial court found, the testimony of S.R.C. established there was a city bus stop directly in front of the school. She was familiar with this fact because she normally caught the public bus at that stop after school. Additionally, although C.C. claimed in her testimony to have no money, Mr. Pollan testified that, in support of the school policy that no child would be left on campus, the office or one of the teachers would have provided her with money to take the public transportation offered.
The evidence is also clear that C.C.’s true intent was to walk home rather than seek out alternatives. Even after she left *1132 the campus, C.C. had access to public transportation. C.C. testified that when she left campus with S.R.C., she knew that S.R.C. had only fifty cents, and that amount was required for her ride home. Yet, C.C. also testified that when they arrived at the restaurant, S.R.C. purchased food and yet still had fifty cents to ride the bus. However, S.R.C. did not support C.C.’s testimony on her lack of money. S.R.C. testified that, not only did she have adequate |⅞, money to purchase food at the restaurant and ride the public bus, she had enough to loan C.C. the bus fare and offered to do so. According to S.R.C., C.C. responded that she wanted to “wait” at the restaurant. S.R.C. said she did not know what C.C. was waiting for.
This evidence, therefore, supports the trial court’s factual findings that other modes of transportation were available to C.C., that she had no intent to ride the “tutoring bus,” and, lastly, that the School Board did not fail to provide her with adequate and reasonable supervision. Ultimately, we find no manifest error in the trial court’s conclusion that the School Board did not breach its duty of reasonable supervision owed to C.C. We disagree that the School Board’s employees made an “exceedingly bad departure decision” under the facts of this case. Here, the school had in place a policy or practice to make certain that no student would be left on campus. As the trial court found, a telephone was made available to Behavior Clinic students and alternative means of traveling home would have been made available to C.C. had she asked for assistance. Instead, she chose to leave the school grounds rather than telephone her mother or indicate to school personnel in any manner that she had no way to get home.
The instant case is factually distinguishable from D.C. v. St. Landry Parish School Bd. There, the twelve-year-old seventh grade student had been instructed by the vice-principal to change into clothing that did not violate the school dress code on skirt length. She was allowed to use the school telephone to call home, but her brother, the only person there, had no transportation with which to bring her different clothes. Believing the matter to be disciplinary and outside of her concern, the school secretary allowed the student to check herself out of school during school hours, without authority from the principal or vice-principal, in violation of the school’s own 122PoIicy prohibiting such a departure. The student was molested while walking home from school. In finding a breach of the school board’s duty, the court reasoned that, included within the duty of reasonable supervision is the duty to make the appropriate supervisory decisions concerning a student’s departure from campus during regular school hours. 00-1304, p. 6, 802 So.2d at 23. The court concluded the school board breached its duty by violating its own policy with regard to a student’s departure from campus. Id.
Instead, this case is more similar to that in Domingue v. Lafayette Parish School Bd. There, an eleven-year-old middle school student decided to walk home with a friend rather than ride the bus as he had been instructed to do by his mother. He had been punished by his mother on prior occasions for walking home. En route to their neighborhood, which was slightly more than a mile from the school, the student was struck by a vehicle on a busy four-lane highway. The appellate court found no breach of the school board’s duty of reasonable supervision. Domingue, 03-895, 879 So.2d at 294-95. The appellate court found the trial court had erred in imposing a duty on the school board to institute a procedure to distinguish students who were allowed to walk home from school and those who were not. Id. The *1133 court reasoned that, even if such procedures were in place, there is nothing to prevent a “designated walker” from being injured on his way home should he dart out in the street, nor could the school prevent a junior high age student from disobeying the instructions of his mother. Id. at 295. The court refused to impose the requirement of a roll-call of every student exiting the school. Id. The court concluded the school board did not breach its duty “to ensure the orderly and nonviolent flow of children to the appropriate area of departure.” Id. at 296.
^CONCLUSION
As the dissent below reasoned, “[t]he record establishes that the Lafayette Middle School adhered to its policy of making sure that no child would be left on campus by having telephone access, [by] making available other means of transportation, and by providing an on-campus procedure to make sure that everyone has left the campus before locking it down.” S.J. v. Lafayette Parish School Bd., 16 So.3d at 637 (Peters, J., dissenting). We find the trial court properly considered the evidence presented to it, made credibility determinations within its discretion, and reasonably concluded based on the record evidence that the School Board, through its employees at the Lafayette Middle School, did not violate the reasonable supervision duty it owed to C.C.
DECREE
Accordingly, we find no manifest error in the trial court’s factual conclusion that the plaintiffs failed to prove by a preponderance of the evidence that the School Board breached its duty of reasonable supervision owed to C.C. under the circumstances of this case. The court of appeal decision is reversed and the judgment of the district court dismissing the plaintiffs’ suit is reinstated.
REVERSED; JUDGMENT OF THE DISTRICT COURT REINSTATED.

 Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. According to the testimony, C.C. had originally been scheduled to attend Behavior Clinic a week earlier, but had missed it, and it was rescheduled for November 4, 2004. C.C. testified she did not tell her mother either about the Behavior Clinic scheduled the week before or about missing it. S.J. testified she did not learn about the earlier scheduled Behavior Clinic, or about C.C. missing it, until after the November 4th incident.

. The trial court pointed out that, if C.C. had been forced to walk home because of lack of transportation or access to a telephone, it would have had to decide if the alleged harm *1123 she suffered was reasonably foreseeable, and that the plaintiffs’ burden in that regard would have been "difficult.”

. The trial court observed that, having found no breach of the School Board’s duty, it was not required to determine if the alleged rape had actually occurred. The trial court noted "the testimony of Deputy [Guy] Lebreton along with other factors does provide evidence to support a contrary finding.”

. Only two judges in the three-judge majority finding liability on the School Board relied on La.Rev.Stat. 17:158(A)(1) to find a heightened or statutory duty under these circumstances *1126 owed by the School Board with regard to C.C. based on the distance between her home and the school. The third judge in the majority specifically disavowed that reasoning, relying solely on the "reasonable supervision” standard, as did the dissenting two judges. Accordingly, although we decline to find La. Rev. Slat. 17:158(A)( 1) expands the scope of a school board's duty with regard to a certain class of students, we note such a view was never the opinion of a majority of the members of the appellate court panel.

. The author of the lead opinion suggests this statute expands the School Board's duty from one of "reasonable supervision” to one of a "high burden of responsibility,” a requirement not previously articulated by statute or jurisprudence. Specifically, the lead author holds that "[wjhen the school chose to institute a policy contrary to the statutory requirement of free transportation it assumed a high burden of responsibility to ensure that any child denied such transportation has an alternate safe means of getting home.” The concurring judge finds that La.Rev.Stat. 17:158 imposes a duty on the School Board to provide students with transportation home and that this duty "encompasses the risk of C.C. being raped while walking home.”

. Although Mr. Ferrill's time-line is inconsistent with the timing for the end of the tutoring classes and Behavior Clinic (Mr. Ferrill testified he made the copies between 3:00 p.m. and 3:20 p.m.), Ms. Reed testified she observed Mr. Ferrill making the copies as she left the building. His testimony, coupled with Ms. Reed's observation of his presence after the Behavior Clinic students were released, gives credibility to a finding that he was present later than 3:20 p.m. and that he simply was incorrect in his time-line testimony.