TERRI F. LOVE, Judge.
 

 _LjThis appeal arises from a dispute regarding the amount of insurance proceeds disbursed following a fee in the plaintiffs home. The trial court held that Audubon Insurance Company owed the plaintiff additional monies pursuant to the dwelling coverage and $1,300 for a security deposit. The trial court also awarded $25,000 for bad faith penalties, $25,000 for mental anguish, and forty percent attorneys’ fees. We find that the trial court did not err in qualifying Earl Carr as an expert witness, in awarding the dwelling policy limits, and bad faith penalties. However, we find that the trial court erroneously awarded the security deposit and mental anguish damages and reverse.
 

 FACTUAL BACKGROUND AND PROCEDURAL HISTORY
 

 On May 4, 2002, Angela Reilly’s front study caught fire, which caused damage to her home (“Property”). On the same day as the fee, Ms. Reilly contacted Disaster Master Restoration/Cleaning, L.L.C. (“DM”) to clean and store her salvageable belongings. She signed an agreement stating that her insurance company could pay DM directly. Audubon Insurance Company (“Audubon”), Ms. Reilly’s insurer, sent Nolan Allain, a property claims adjuster, to inspect the Property two days after the fire. During the inspection, Ms. Reilly expressed | concern regarding temporary housing and Mr. Allain informed Ms. Cherry of CRS Temporary Housing (“CRS”). Ms. Reilly then contacted CRS and signed an agreement for Audubon to pay CRS directly for her temporary additional living expenses (“ALE”).
 

 On May 20, 2002, Mr. Allain sent Ms. Reilly a $21,457.21 dwelling estimate to repair the fire damage to the Property. Ms. Reilly disagreed with Mr. Allain’s estimate. Mr. Allain then contacted Rip Bar-berio, a licensed Louisiana contractor, to conduct a second inspection of the Property
 
 [1]
 
 and to prepare an additional estimate. Mr. Allain received Mr. Barberio’s $31,858.06 estimate on June 7, 2002, and forwarded the estimate to Ms. Reilly on June 12, 2002. Also on June 12, 2002, Audubon paid CRS $12,010 for three and a half months of rent plus a deposit.
 

 After receiving Mr. Barberio’s estimate, Ms. Reilly hired Carr & Associates as her loss consultants. David Powell, of Carr & Associates, sent a letter to Mr. Allain on July 9, 2002, to advise him that he would be preparing an estimate and to designate Carr & Associates as an additional payee on checks issued by Audubon.
 
 [2]
 
 Audubon then tendered a check made payable to Ms. Reilly and Carr & Associates for $31,358.06, Mr. Barberio’s dwelling estimate for damage to the Property, on July 23, 2002.
 

 Audubon received a $29,795.22 invoice from DM in August. Upon learning of DM’s estimate, Ms. Reilly instructed Audubon not to pay DM. Ms. Reilly did not complete the inventory lists of her damaged/lost contents to Mr. Allain as instructed. However, on September 25,
 
 *112
 
 2002, Audubon paid an additional $1,898 to Ms. Reilly for ALE.
 

 [aOn October 10, 2002, Audubon received a dwelling estimate of $149,589.50 and a $196,229.14 contents estimate from Carr & Associates. On October 28, 2002, Audubon paid Ms. Reilly $40,000, her policy limits on her contents claim. Ms. Reilly was also paid $2,092, her policy limits, for ALE.
 

 Subsequently, Ms. Reilly filed a petition for damages against Audubon, DM, and Kenneth Taylor, her insurance agent. Ms. Reilly alleged that Audubon failed to pay her claim within thirty days pursuant to La. R.S. 22:658, that DM failed to return her belongings after overcharging and performing unauthorized services, and because Audubon sent her a letter cancelling her insurance policy on November 19, 2002, as a result of the “total loss” of the Property.
 
 [3]
 
 DM then filed a cross-claim against Ms. Reilly seeking $41,026.50 for services rendered, penalties, and storage fees. Ms. Reilly filed a supplemental and amended petition in order to seek La. R.S. 22:1220 penalties against Audubon for failure to pay within sixty days.
 

 Ms. Reilly dismissed Mr. Taylor from the present suit with prejudice. The trial court granted a joint motion to bifurcate Ms. Reilly’s claims against Audubon from those of DM. Following a five-day bench trial regarding Ms. Reilly’s claims against Audubon, the trial judge entered a judgment awarding Ms. Reilly $48,141.94 for the balance of her dwelling policy limits and $1,300 for a security deposit paid to CRS. The trial judge also awarded Ms. Reilly $25,000 for bad faith penalties, $25,000 for mental anguish, and forty percent attorneys’ fees.
 

 Audubon asserts that the trial court erred in qualifying Earl Carr, Jr. as an expert in loss adjustment, by awarding further damages under Ms. Reilly’s policy, by awarding the security deposit, and for awarding bad faith and mental anguish 14damages.
 

 STANDARD OF REVIEW
 

 When reviewing findings of fact made by the trial court judge, appellate courts utilize the manifest error/clearly erroneous standard of review.
 
 S.J. v. Lafayette Parish Sch. Bd.,
 
 09-2195, p. 12 (La.7/6/10), 41 So.3d 1119, 1127. To effectuate a reversal, the appellate court must find that no reasonable factual basis exists for the trial court’s findings and that the record connotes the findings are clearly wrong.
 
 Id.
 
 Thus, we must determine whether the trial court judge’s factual conclusions were reasonable.
 
 Stobart v. State through Dept. of Transp. and Dev.,
 
 617 So.2d 880, 882 (La.1993). “Accordingly, where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous.”
 
 S.J.,
 
 09-2195, p. 13, 41 So.3d at 1127.
 

 “When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings.”
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989). This is because “only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.”
 
 Id.
 
 An appellate court may find manifest error when “documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness’s story.”
 
 S.J.,
 
 09-2195, p. 13, 41 So.3d at 1127. However, if “a factfinder’s finding is based on its decision to credit the testimo
 
 *113
 
 ny of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.”
 
 Rosell,
 
 549 So.2d at 845.
 

 Legal questions are reviewed with the
 
 de novo
 
 standard of review.
 
 Friedman v. Louisiana State Bd. of Dentistry,
 
 08-0882, p. 2 (La.App. 4 Cir. 1/07/09), 3 So.3d 565, 567.
 

 EXPERT WITNESS QUALIFICATION
 

 Audubon asserts that the trial judge erred in qualifying Mr. Carr, of Carr & Associates, as an expert because he is neither a licensed public adjuster nor a licensed contractor and is under an injunction to enjoin him from engaging in the unauthorized practice of law.
 
 [4]
 

 La. C.E. art. 702 provides:
 

 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 

 “It is well-established that the trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and his judgment will not be disturbed by an appellate court unless clearly erroneous.”
 
 Versluis v. Gulf Coast Transit Co.,
 
 08-0729, p. 5 (La.App. 4 Cir. 7/29/09), 17 So.3d 459, 463. The trial court’s discretion “includes the determination of how much and what kind of education and/or training adequately qualify an individual as an expert.”
 
 Tadlock v. Taylor,
 
 02-0712, p. 4 (LaApp. 4 Cir. 9/24/03), 857 So.2d 20, 26. Formal education is “not always necessary” and experience may be sufficient.
 
 Becnel v. Lafayette Ins. Co.,
 
 99-2966, p. 7 (La.App. 4 Cir. 11/15/00), 773 So.2d 247, 251.
 

 Following Mr. Carr’s extensive testimony regarding his background, the trial judge qualified him as an expert because his “background certifies him to be able to testify as to the loss estimate given to” Ms. Reilly. The trial judge also limited the scope of Mr. Carr’s testimony due to the injunction and disallowed any preference to Mr. Carr advising or consulting Ms. Reilly. Further, the trial judge stated that Audubon’s objections to Mr. Carr’s expert status “may affect the weight given to his testimony,” but that Ms. Reilly would be prejudiced if Mr. Carr was not permitted to testify.
 

 The trial was non-jury, meaning only the judge would weigh the testimony of witnesses as opposed to a jury. Given the trial judge’s limitation of Mr. Carr’s testimony and the qualified weight to be given to his testimony, we do not find that the trial judge abused her discretion or manifestly erred in qualifying Mr. Carr as an expert witness.
 

 DWELLING COVERAGE
 

 It is undisputed that Audubon insured Ms. Reilly’s dwelling up to $80,000. The trial court ordered Audubon to pay Ms. Reilly $48,141.94, the remainder of her dwelling policy limits. Audubon adamantly protests that it paid all of the monies due to Ms. Reilly for her dwelling coverage and that she failed to prove entitlement to the policy limits. Ms. Reilly contends that she is owed the remainder of her policy limits due to extensive damage to her home exceeding Audubon’s payment, which included damage to her roof allegedly caused by firefighters extinguishing the fire.
 

 
 *114
 
 Ms. Reilly stated that the fire was “engulfing the entire front room,” that “the flames were leaking out of the doorway,” and “over the front door and towards the front windows.” During the fire, she remembered seeing three fire trucks, one or two “giant” fire hoses being brought in through the front door, and at least one firefighter climbing onto her roof. After the fire was extinguished, Ms. Reilly testified that the Property was covered in smoke and water. She further testified that it seemed like the smoke went into the walls. The firefighters also 17smashed the ceiling in the study to inspect how far the fire spread. The Property was uninhabitable. Therefore, she telephoned DM and asked it to board up her house and save the furniture/contents that could be saved.
 

 As to Mr. Allain’s inspection of the Property, Ms. Reilly recounted that he was only on the Property for about 10 minutes and she thought that was an insufficient amount of time to view all of the damage. Ms. Reilly also testified that Mr. Allain told her that he was “from Audubon Insurance, a subsidiary of AIG and AIG is on the hook for the World Trade Centers and we’re not giving out much money.” When Ms. Reilly became concerned about temporary housing, Mr. Allain suggested CRS. Ms. Reilly thought that Audubon would negotiate rent for her temporary apartment. However, when Ms. Reilly discovered the high cost of her apartment, $2,970 a month, she moved to a less expensive one bedroom studio apartment with $350 of rented furniture.
 

 Ms. Reilly stated that the roof was in “bad condition” after the fire and water entered the Property. However, Ms. Reilly did admit that her roof had “ponding” since she bought the Property. Ms. Reilly also stated that mold began to grow within weeks of the fire because the ceiling and walls were soaked with water. As for the_ exterior of the Property, Ms. Reilly testified that there was smoke damage on the stucco and smashed windows. After receiving both Mr. Allain’s and Mr. Barber-io’s estimates, Ms. Reilly testified that she felt the need to hire Carr & Associates for a loss estimation because of the low estimates provided by Audubon.
 

 David Johnston, a fact witness for Ms. Reilly who lived across the street at the time of the fire, testified that there was at least one firefighter on the roof of the Property. Jerri Johnston, another fact witness, stated: “I remember specifically at |sleast one firefighter on the roof with a hose.” He then testified that he realized that the damage was going to be from the water being used to extinguish the fire.
 

 A1 Schmolke, Jr., a New Orleans Fire Department (“NOFD”) captain, testified that the fire in the Property was a standard one-room fire, which did not breach the ceiling, but had heavy smoke damage. Capt. Schmolke stated that he did not get on the roof and does not remember any other firefighters getting on the roof. He testified that they do not go onto roofs unless it is necessary and does not remember any reason to in the current case, but admitted that it was possible. While he witnessed heavy smoke damage to the walls, he did not see the heat melt anything two or three rooms away. Capt. Schmolke thinks that they only used one hose, but he could not honestly remember. He had a rough firefighter estimate of $60,000 dwelling damage and $35,000 contents damage. Capt. Schmolke conjectured that water could damage the Property after they left and that they might have broken some windows for ventilation when trying to get the smoke out of the Property.
 

 Gerard Aitken, another NOFD captain, remembered only one hose being used in
 
 *115
 
 the Property and did not see any firefighters on the roof. While the fire damage was “more or less” confined to the study, the rest of the Property experienced smoke damage. Capt. Aitken remembered putting one hole in the ceiling of the study to check for fire. He also testified that smoke can get into walls and that just painting the walls will fail to rid the Property of the smell of smoke. He did not break any windows, but other firefighters could have.
 

 Robert Anderson, Ms. Reilly’s expert in structural engineering who inspected the house before and after the fire, testified that the membrane of the roof was “compromised with punctures” after the fire “probably due to a significant 19amount of activity on the surface of the roof.” He stated that “dragging a fire hose probably did more damage to the membranes than the actual firefighter” and that a firefighter’s foot could go through the roof sheathing. After the fire, Mr. Anderson observed damage to the bridging of the roof, trusses, and decking on the roof. He also noticed water damage. Mr. Anderson recommended removing everything down to the sheathing, reinforcing all of the trusses, and repairing cracked beams prior to putting a on a new roof. However, he did not see any fire damage on the roof. He also documented damage to the exterior walls, which he thought was caused by an effort to extinguish the fire. When questioned about his pictures of the inside of the Property, he stated that more probably than not, the discoloration in the photos was mold. Mr. Anderson concluded that the HVAC system was damaged and needed to be replaced. Based on his observations, Mr. Anderson concluded that demolishing and rebuilding the Property was more prudent than the cost of restoration. On cross-examination, Mr. Anderson testified that it was possible that ponding water caused roof damage, but he thought it was related to extinguishing the fire.
 

 Mr. Carr visited Ms. Reilly’s home four or five times and observed that everything in the study was destroyed with very heavy smoke and heat damage in the living/dining room. Mr. Carr stated that the Carr and Associates’ estimate provided that the plaster and sheetrock should be removed and replaced. Mr. Carr also observed smoke and water damage in all of the rooms with heavy condensation and water streaking down the walls. Smoke also entered the cedar closet, which necessitated changing out the cedar because the aromatic wood would be irreparably damaged by smoke. Mr. Carr stated that the HVAC system appeared damaged with a vent or filter that was pretty black. Further, he testified |10that he recommended replacing the interior HVAC unit, air handler, and ductwork.
 

 As a result of the mold growth since Audubon’s inspection and his “chimney effect” wherein smoke gets into crevices in the walls, Mr. Carr suggested that all walls be replaced. He further stated that the smoke created a caustic or corrosive situation in the bathrooms, which necessitated the complete renovation of the bathrooms. Also, Mr. Carr thought the heat from the fire could have damaged the wax seals around the toilets. As for the kitchen, Mr. Carr observed mold. He recommended that the acoustic tile ceiling be replaced due to buckling and sagging. Overall, the estimate of Carr and Associates encompassed replacing all of the walls, flooring, ceilings, bathrooms, roofing, light fixtures, electrical outlets, electrical switches, doors, door casings, the thermostat, kitchen cabinets,
 
 [5]
 
 and the HVAC
 
 *116
 
 system. The Carr & Associates estímate included replacing all walls that were comprised of plaster and drywall to be replaced with plaster and drywall to avoid the windows and sockets no longer being flush with the walls.
 

 The software Mr. Carr and Mr. Powell utilized to create the estimate was licensed and contained up-to-date unit costs. Carr & Associates computer software allowed for substituting unit costs, but those substitutions would be denoted by asterisks or highlighting. Mr. Carr also stated that he attempted to arrange for Mr. Allain to meet him at the Property to no avail because Mr. Allain did not want to inspect additional damage.
 

 Mr. Allain, the Audubon claims adjuster handling Ms. Reilly’s claims, testified that he inspected the Property within two days after the fire and remained for three hours minus travel time. Mr. Allain did not inspect the roof or the HVAC system, but stated that it was possible that some HVAC damage existed. He did |T , testify that the moisture resulted from “[wjhatever reason caused it” during or after the fire. During his inspection, Mr. Allain looked into the hole in the ceiling of the study and found no evidence of fire, flames, smoke, or soot on the rafters. He recommended that the study and the living/dining room be completely gutted and replaced with sheetrock only because any plaster placed beneath it would be ruined. Mr. Allain suggested cleaning and painting the bedrooms, replacing the carpet in the kids’ bedrooms, and refinishing the floors in the master bedroom. His recommendation was to clean the bathrooms because each one only had smoke damage. The hallway and the kitchen needed to be cleaned and painted. The floors in the hallway could be refinished, while the kitchen floors needed replacing. Mr. Al-lain did not smell any smoke in the cedar closet. In the den, Mr. Allain suggested that everything could be cleaned and painted except that the acoustic tile ceiling needed replacing along with the vinyl flooring. As for the exterior of the Property, Mr. Allain recommended pressure washing the stucco. Mr. Allain claimed that he intended to inform Ms. Reilly that his estimate was a starting point.
 

 Because months elapsed between Mr. Allain’s estimate and Carr & Associates’ estimate, Mr. Allain testified that it was possible that the dwelling check issued to Ms. Reilly was insufficient to repair the Property because the scope of the damage would have increased. However, at the time of the estimate he believed that $31,858 was adequate. Mr. Allain also agreed that “there’s probably some additional damage today above the $81,000,” that the estimate for the study should have included plaster, and that he could not speculate on further damage in the remainder of the Property because he never returned for another inspection and mold would become a concern. Overall, Mr. Allain testified that “[i]t certainly | i2would have gotten worse than when I looked at it.” In Mr. Allain’s letter to Audubon’s Loss Committee regarding the Property he wrote that the rest of the Property sustained very heavy smoke and water damage even though his estimate did not reflect that statement. Mr. Allain stated that his software was up-to-date as far as he knew.
 

 Mr. Barberio, Audubon’s expert in general contracting, was asked to perform a loss estimate on the Property by Audubon
 
 *117
 
 after Ms. Reilly expressed her disagreement with Mr. Allain’s estimate. The software he utilized to formulate the estimate was on a computer he purchased in 1996 and the software was already on the computer at the time of his purchase. His usage of the software was not licensed and admitted that the last update on the unit costs was in 1996.
 
 [6]
 
 However, unit costs could be manually changed. While he used 1996 unit costs, Mr. Barberio testified that he “went back and changed some of them,” but he could not remember how many he changed. Mr. Barberio testified that he inspected the Property for one to two hours, but that he never inspected the roof or the HVAC system/vents. Mr. Bar-berio would defer to a structural engineer’s report regarding roof damage. When Mr. Barberio discovered the plaster behind the sheetrock walls, Mr. Allain told him just to include the cost of sheetrock in the estimate.
 

 Mr. Barberio’s estimate included gutting the study and living/dining room. However, Mr. Barberio concluded that the walls in all of the rooms except for the study and the living/dining room could be cleaned and painted. He did not think that the bathroom plastics, sinks, or toilets were damaged or needed replacing. Mr. Bar-berio’s estimate did include cleaning a portion of the exterior stucco. Like, Mr. Carr, he suggested replacing the acoustic ceiling and flooring in the den, replacing | isthe carpet in the two bedrooms, and replacing the vinyl flooring in the kitchen. However, he did not see a cedar closet. On cross examination, Mr. Barberio did admit that the damage to the walls could have changed while the Property was sitting closed up and that the condition of the Property was not going to improve after his inspection.
 

 Ashton Avegno, Audubon’s expert in civil and structural engineering who was retained on August 28, 2008, visited the Property in late August or September 2008. Mr. Avegno testified that even after Hurricane Katrina he could still tell which roof structures were damaged by fire. He did not see any evidence of fire damage to the roof or ceiling structure. Mr. Avegno calculated that the roof had a total load capacity of roughly 39,000 pounds and stated that firefighters with hoses would not damage the roof. However, his calculations were not based on the assumption that the roof timbers were cracked such that it would impair the roofs structural integrity. Further, he testified that it was “very unlikely” that the splits in Mr. Anderson’s photographs were caused by firefighters. He did not know if the roof was safe to walk on. Overall, Mr. Avegno testified that roofing activities and rainstorms were more likely to damage the roof than firefighters. As to the floors, Mr. Avegno found the subfloors to be structurally sound except for some areas that were rotten or physically damaged. Mr. Avegno also opined that the moisture damage occurred over a long period of time before the fire.
 

 Audubon asserts that Ms. Reilly did not prove her entitlement to her dwelling policy limits. The two estimates provided by Audubon were written within two and a half months after the fire. However, given the disparity between the amount of those estimates and Ms. Reilly’s beliefs, Ms. Reilly had to retain Carr & Associates to prepare an estimate months after the fire, which meant the | [Property had deteriorated since the first estimates. Also, Audubon’s structural engineer did not inspect the Property until six years later and after Hurricane Katrina.
 

 
 *118
 
 The trial judge, as the trier of fact, heard the testimony of the experts and determined their credibility. As such, their testimony was weighed accordingly and the trial judge formulated a reasonable conclusion. The trial judge heard the juxtaposed expert testimony of the structural engineers’ opinions on alleged roof damage and the estimators’ opinions regarding the amount of dwelling damages, which included the testimony of increasing damage due to the passage of time as the cause of some of the disparity of the estimates. Additionally, Mr. Allain agreed that the Property’s condition would only worsen while sitting vacant and boarded up, which would require increased repairs and money than Mr. Allain’s or Mr. Bar-berio’s estimates documented. Therefore, we do not find that the trial court committed manifest error in awarding Ms. Reilly the remainder of her dwelling policy limits, which was $48,141.94.
 

 SECURITY DEPOSIT
 

 Audubon alleges that the trial court erred by ordering it to pay Ms. Reilly $1,300 for a security deposit paid to CRS.
 

 Ms. Reilly did not recall receiving a $1,300 refund from Audubon or CRS. The record lacks evidence that Audubon received a $1,300 refund from CRS. As Mr. Allain testified, it is undisputed that Ms. Reilly had $16,000 ALE coverage. Audubon made three payments for ALE, which totaled $16,000 and exhausted her ALE policy limits. The record is devoid of evidence establishing Ms. Reilly’s entitlement to the $1,300 since nothing reflects Audubon’s receipt, which would result in an award of additional ALE coverage from Audubon. An additional 11S$1,300 would exceed Ms. Reilly’s coverage if CRS did not refund the deposit to Audubon. Therefore, we find the trial court erred by awarding Ms. Reilly $1,300 and reverse.
 

 BAD FAITH
 

 Audubon contends that the trial court erred in awarding Ms. Reilly $25,000 in bad faith penalties pursuant to either La. R.S. 22:658(B)(1) or La. R.S. 22:1220(B)(5).
 
 [7]
 
 “The prohibited conduct under these two statutes is virtually identical: ‘the failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause.’ ”
 
 Boudreaux v. State Farm Mut. Auto. Ins. Co.,
 
 04-1339, p. 3 (La. App. 4 Cir. 2/2/05), 896 So.2d 230, 233,
 
 quoting Reed v. State Farm Mut. Auto. Ins. Co.,
 
 03-0107, p. 12 (La.10/21/03), 857 So.2d 1012, 1020. The difference between the statutes is the time period permitted for payment. La. R.S. 22:658 requires payment within thirty days of receiving satisfactory proof of loss and La. R.S. 22:1220 requires payment within sixty days. Both statutes impose a penalty when the failure to pay is “arbitrary, capricious or without probable cause.”
 
 See
 
 La. R.S. 22:658 and La. R.S. 22:1220.
 

 “To initiate loss adjustment requires that ‘the insurer take some substantive and affirmative step to accumulate the facts that are necessary to evaluate the claim.’ ”
 
 Talton v. USAA Cas. Ins. Co.,
 
 06-1513, pp. 13-14 (La.App. 4 Cir. 3/19/08), 981 So.2d 696, 706,
 
 quoting Hollier v. State Fam Mut. Auto. Ins. Co.,
 
 01-0592, p. 4 (La.App. 4 Cir. 10/31/01), 799 So.2d 793, 797,
 
 quoting McClendon v. Econ. Fire & Cas. Ins. Co.,
 
 98-1537, p. 7 (La.App. 3 Cir. 4/7/99), 732 So.2d 727, 731. The statutes are strictly construed because they are penal in nature.
 
 Maurice v. Prudential
 
 
 *119
 

 Ins. Co.,
 
 02-0993, p. 9 (La.App.10/23/02), 831 So.2d 381, 388. Ms. Reilly was required to prove: (i) that the insurer received a satisfactory proof of loss, (ii) that the insurer failed to pay the claim within the applicable statutory period, and (iii) that the insurer’s failure to pay was arbitrary and capricious.
 
 Boudreaux,
 
 04-1339, p. 4, 896 So.2d at 233.
 

 “Satisfactory proof of loss ... is that which is sufficient to fully apprise the insurer of the insured’s claim.”
 
 Maurice,
 
 02-0993, p. 10, 831 So.2d at 388. “[Statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and was acting in good-faith reliance on that defense.”
 
 Id.
 
 When reasonable questions exist as to the extent of the claim, bad faith should not be inferred.
 
 Id.
 
 Additionally, penalties should not be assessed unless the record is clear “that the insurer was in fact arbitrary, capricious, and without probable cause in refusing to pay.”
 
 Maurice,
 
 02-0993, p. 9, 831 So.2d at 388.
 

 Ms. Reilly testified that Mr. Allain told her that she would be back in her home within three months after inspecting the Property. Mr. Allain’s estimate was completed on May 20, 2002. .Mr. Barberio’s estimate was completed on June 5, 2002. Audubon did not issue a check based upon Mr. Barberio’s dwelling estimate until July 18, 2002. In late June or early July 2002, Ms. Reilly hired Carr & Associates due to the dispute regarding the estimates. On August 15, 2002, DM gave Audubon a $29,795.22 invoice regarding Ms. Reilly’s contents. Ms. Reilly did not return the inventory/contents lists provided to her by Mr. Allain, but Carr & Associates sent Ms. Reilly’s $196,229.14 contents estimate on September 28, 2002. However, Ms. Reilly did not receive any payment for her contents claim until October 28, 2002, when she received her contents policy limits in full. Mr. Allain alleges that Audubon was unaware of the amount of contents Ms. Reilly |17was claiming until he received Carr & Associates $196,000 contents estimate.
 
 [8]
 
 However, Audubon possessed a satisfactory proof of loss of at least part of Ms. Reilly’s contents by the May 20, 2002 estimate completion date and by the DM invoice in August, which followed his inspection of the Property. Carr
 
 &
 
 Associates also sent Ms. Reilly’s dwelling estimate to Audubon on September 28, 2002. However, Ms. Reilly testified that no attempts were made to mediate or resolve her claim after Audubon tendered the initial dwelling check and Audubon never returned to the Property to investigate the additional dwelling claims even though Mr. Allain testified that the Property’s condition would worsen, which would thereby increase the damages.
 

 When asked, Mr. Allain opined that if Ms. Reilly requested an advance, he probably could have received permission to advance around $2,500 on the contents policy, but he followed standard operational procedures. He then testified that the only way to pay a partial contents claim was if you had an inventory list. Mr. Allain claims that the contents limits were paid after Audubon received Carr & Associates estimate and DM’s bill, but Audubon received DM’s bill in August, as stated above. Mr. Allain thought the estimate from Carr & Associates was “just ... unbelievable because it was practically rebuilding the whole house.” His notes reflect that he saw no point in meeting with Mr. Carr unless Ms. Reilly was willing to settle for $1,000 or $2,000 more. As to
 
 *120
 
 meeting with Mr. Carr, Mr. Allain stated that he never refused to meet with Mr. Carr, but he doubted that any negotiation would occur. Mr. Main’s testimony also reflects that he was aware that the Property’s damage would increase the longer it remained boarded up, yet he never inspected the Property a second time after receiving the estimate from Carr & | ^Associates.
 

 Given the testimony provided in the record, Audubon was, at the very least, aware that Ms. Reilly was owed some money on her contents policy on May 20, 2002. Audubon did not tender any money to Ms. Reilly regarding her contents claim until October 28, 2002, well over the thirty and sixty day time periods, and more than sixty days after receipt of DM’s invoice related to contents. Additionally, Audubon never attempted to reinspect the Property after receipt of Carr & Associates’ estimate. Accordingly, we find that the trial court’s judgment was based on reasonable factual conclusions. Therefore, the trial court was not manifestly erroneous in awarding $25,000 in bad faith penalties.
 

 MENTAL ANGUISH
 

 Audubon avers that the trial court erred in awarding Ms. Reilly $25,000 for mental anguish. The trial court judge did not indicate her reasons for awarding mental anguish damages.
 

 This Court held that damages may be recovered for mental anguish if an insurer breaches its duty of good faith.
 
 Orellana v. Louisiana Citizens Prop. Ins. Corp.,
 
 07-1095, pp. 5-6 (La.App. 4 Cir. 12/5/07), 972 So.2d 1252, 1256. “However, La. C.C. art. 1998 provides that if the contract breached is not ‘intended to gratify a nonpencuniary interest,’ damages for non-pecuniary losses ‘may be recovered ... when the obligor intended, through his failure, to aggrieve the feelings of the obli-gee.’ ”
 
 Veade v. Louisiana Citizens Prop. Corp.,
 
 08-0251, p. 7 (La.App. 4 Cir. 6/4/08), 985 So.2d 1275, 1280;
 
 quoting
 
 La. C.C. art. 1998. The object of an insurance contract is the payment of money.
 
 Id.
 
 The Louisiana Supreme Court pronounced that evidence should demonstrate that the insurer knew or should have known that his failure to perform would cause mental anguish damages.
 
 Sher v. Lafayette Ins. Co.,
 
 07-2441, p. 20 (La.4/8/08), 988 So.2d 186, 202. The plaintiff must also prove that the insurer “intended, through his failure, to aggrieve the feelings of the obligee,” pursuant to La. C.C. art. 1998.
 
 Sher,
 
 07-2441, pp. 19-20, 988 So.2d at 202.
 

 Ms. Reilly testified that everything after the fire was overwhelming and devastating. She stated that Mr. Main’s alleged remark regarding the terrorist attacks of September 11, 2001, were troubling. She also received letters from Audubon stating that she was no longer insured because of the “total loss” of her home. This caused her to purchase additional insurance even though Audubon reinstated her insurance policy in January 2003, with no lapse in coverage. Audubon informed her that the cancellation letters were a mistake. Further, Ms. Reilly testified that she had to withdraw money from her IRA, incurring penalties, in order to begin repairing her home. She estimated spending $100,000 renovating the Property after the fire.
 

 Mr. Main did not know why Ms. Reilly received a cancellation letter because he never advised anyone that the Property was a total loss.
 

 While Ms. Reilly was reasonably upset by the lack of alacrity in the disputed adjustment process, given the record before us, we find that Ms. Reilly failed to prove that Audubon intended to aggrieve her feelings. Accordingly, we find that the
 
 *121
 
 trial court erred in awarding mental anguish damages and reverse.
 

 DECREE
 

 For the above mentioned reasons, we find that the trial court did not err by qualifying Mr. Carr as an expert witness, in awarding dwelling policy limits, or in awarding bad faith penalties. However, we find that the trial court erred in awarding $1,300 for the CRS security deposit and awarding $25,000 for mental | gpanguish damages and reverse.
 

 AFFIRMED IN PART; REVERSED IN PART.
 

 [1]
 

 . Mr. Barberio inspected the Property while it was under repair for an eight inch differential settlement.
 

 [2]
 

 . Ms. Reilly’s agreement with Carr & Associates states that it receives fifteen percent of monies recovered.
 

 [3]
 

 . Ms. Reilly's insurance policy was later reinstated, as the cancellation was an error.
 

 [4]
 

 .
 
 See Louisiana State Bar Ass’n. v. Carr and Associates, Inc.,
 
 08-2114 (La.App. 1 Cir. 5/8/09), 15 So.3d 158,
 
 writ denied,
 
 09-1627 (La.10/30/09), 21 So.3d 292.
 

 [5]
 

 . Mr. Carr admitted that he mistakenly overestimated the value of the kitchen cabinets.
 
 *116
 
 However, he further stated that any overage mistakes were subsumed by underestimation mistakes contained in the estimate.
 

 [6]
 

 . The trial court judge stated that the information regarding Mr. Barberio’s software would change the weight given to his testimony-
 

 [7]
 

 . The statutes are now numbered La. R.S. 22:1892 and La. R.S. 22:1973, respectively. The trial court judge did not indicate the statute she was using to assess penalties.
 

 [8]
 

 . Audubon attempts to attack Ms. Reilly’s credibility and contents claim based upon a previous bankruptcy filing wherein contents are valued differently than for insurance purposes. However, the issue of contents coverage is not an issue in the present case.