# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-598

ESTELA CALLIER

VERSUS

LAFAYETTE CITY-PARISH CONSOLIDATED

GOVERNMENT, ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20185533
HONORABLE SCOTT J. PRIVAT, DISTRICT JUDGE

**********

**SHANNON J. GREMILLION**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Chief Judge, Shannon J. Gremillion, and D. Kent Savoie, Judges.

**AFFIRMED AS AMENDED**

**C. Shannon Hardy**
**John W. Penny, Jr.**
**Penny & Hardy**
**600 Jefferson Street, Suite 601**
**Lafayette, LA 70502**
**(337) 231-1955**
**COUNSEL FOR DEFENDANT/APPELLANT:**
   **Lafayette City-Parish Consolidated Government**

**Gregory Jesse Logan**
**The Logan Law Firm**
**P. O. Box 52704**
**Lafayette, LA 70505**
**(337) 406-9685**
**COUNSEL FOR DEFENDANT/APPELLANT:**
   **Lafayette City-Parish ConsolidatedGovernment**

**Dustin B. Gibson**
**Dustin B. Gibson Law, LLC**
**301 E. Kaliste Saloom Road, Suite 400**
**Lafayette, LA 70508**
**(337) 501-2418**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
   **Estela Callier**

**Errol L. Cormier**
**Errol L. Cormier, APLC**
**301 E. Kaliste Saloom Road, Suite 400**
**Lafayette, LA 70508**
**(337) 237-2100**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
   **Estela Callier**

**GREMILLION, Judge.**

The Lafayette City-Parish Consolidated Government (LCP) appeals a judgment in favor of Estella Callier that awarded her $200,00.00 in general damages, $16,051.56 in past medical expenses, lost wages of $5,600.00, and $11,000.00 in future medical expenses to be held in a reversionary trust, for injuries she sustained in a September 9, 2017, automobile accident. Ms. Callier answered the appeal and asks that we increase the trial court's award of future medical expenses to include expenses for a lumbar fusion surgery her treating orthopedic surgeon has recommended. For the reasons that follow, we amend the trial court's judgment and affirm as amended.

## FACTS[1]

*The accident*

Ms. Callier was involved in a one-car accident on St. Esprit Road near Carencro, Louisiana, on the evening of September 9, 2017. Ms. Callier was driving from work at Pogie's, a bar in Carencro, to her home. Her friend, Michael DiBenedetto, was following her in his vehicle. The two had discussed the difficulty traffic in the area sometimes posed, and Ms. Callier was showing Mr. DiBenedetto an alternate route along St. Esprit Road. However, as Ms. Callier had only lived in the area for about three years, she was not thoroughly familiar with St. Esprit Road.

St. Esprit Road is a mostly rural, sparsely lit, asphalt road in Lafayette Parish. It generally flows in a north-south direction, but, in the area of the accident, the north-south flow is interrupted by a roughly 300-yard section that runs east-west. Along this east-west section lies the home of Mr. Louis Leger. Mr. Leger's home sits on the south side of St. Esprit Road. The road is lined by drainage ditches, and

---

[1] The following facts are gleaned from the trial testimony of the witnesses called at trial.

Mr. Leger's driveway crosses the ditch at a culvert topped by dirt or gravel and edged with railroad crossties.

Mr. DiBenedetto's vehicle was following Ms. Callier's at a distance of approximately twenty-five feet. He had no recollection of whether Ms. Callier's car was favoring one side of her lane. Mr. DiBenedetto saw Ms. Callier's vehicle's front right corner dip, then begin to flip end-over-end, then roll until it struck a tree. Mr. DiBenedetto immediately stopped his car and went to attend to Ms. Callier, who indicated that she did not feel injured. When ambulance personnel dispatched to the scene offered to transport Ms. Callier to the hospital, she refused.

Mr. DiBenedetto took photos of Ms. Callier's car. He also examined the roadway in the area where the car had dipped and noticed that a portion of the asphalt along the edge had broken. A chunk of broken asphalt at the scene was described by Mr. DiBenedetto as "dark black."

Ms. Callier described driving in her lane on St. Esprit Road, which she described as narrow, when she heard a "thump" as though she struck an object in the road. She believed that she was centered in her lane. Ms. Callier immediately felt as though someone had grabbed her steering wheel and jerked her car to the right. Ms. Callier does not recall how many times her car flipped or rolled. She believes that her car flipped after it struck the culvert at Mr. Leger's driveway.

After the accident, Ms. Callier spoke to the investigating police officer, who asked her to provide a written statement. In that statement, she indicated that she struck an object in the roadway. After Ms. Callier completed this brief written statement, she, the investigating officer, and Mr. DiBenedetto walked over to the scene of the accident and found one of the railroad crossties from Mr. Leger's driveway in the road. A tow truck driver removed the crosstie from the road.

2

Ms. Callier sued LCP, asserting that the roadway is unreasonably dangerous and that LCP had actual or constructive notice of its defects, yet failed to correct them.

*The road*

As previously stated, St. Esprit Road is a rural road. It has no fog line to delineate its edge.

Troy Broussard used to live on St. Esprit Road, but not at the area of the accident. Mr. Broussard described the road as deteriorating and narrow. He was involved in an accident on St. Esprit Road in which his tire went over the edge of the paved portion, causing him to veer off the roadway and hit a tree. The lane width at the scene of Mr. Broussard's accident was six feet; however, Mr. Broussard conceded that his accident was not at the same location as Ms. Callier's. Mr. Broussard had complained to his councilman about the condition of St. Esprit Road.

Mr. Leger has lived on St. Esprit Road for about twenty years. At the scene of the accident, there has been a cracked area "for a while;" however, he does not recall whether that cracking was present before Ms. Callier's accident. Mr. Leger does not believe that the cracking has narrowed the lane widths. Other than this particular area, Mr. Leger maintains, the road is fine. He stated that the area is cracked due to gradual erosion into the drainage ditch.

Mr. Leger thinks there have been three accidents in the vicinity of his house, but he cannot recall whether any accidents happened before Ms. Callier's. He agrees that LCP regularly repairs potholes and the like. He has never called LCP to complain about the road.

Mr. Warren Abadie is the LCP Director of Traffic, Roads, and Bridges. He oversees the Traffic Engineering, Sign, and Pavement Marking Divisions. LCP's

3

total inventory of asphalt-paved roads exceeds 300 miles. Mr. Abadie estimates that rural roads such as St. Esprit comprise fifty to one hundred of those miles.

St. Esprit Road does not meet the criteria for definition as a low-volume road. It sees between 400 and 500 vehicles a day. The right of way is limited, so the opportunities for widening the road would pose significant costs.[2] The *Manual on Uniform Traffic Control Devices*[3] does not mandate either center striping or edge striping, also known as a fog line, on roads such as St. Esprit; nevertheless, LCP has center-striped the road. St. Esprit Road is eighteen feet wide.

LCP relies on citizen service requests to identify immediate repair needs. Otherwise, roads are inspected regularly as part of the LCP overlay program. When a citizen repair request is received, that information is entered into a program called Cityworks. The program automatically refers that request to the maintenance foreman, who would then route it to the labor foreman.

One such request was received by LCP on April 11, 2017, regarding erosion of the road into the ditch. This request was forwarded to Mr. John Richard, then streets foreman, with instructions that the entire road be inspected. An inspector would mark areas in need of repair with white spray paint. The April 11 ticket was returned the following day with the notation that it had been completed.

Inspectors can distinguish fresh asphalt breakage from older because newly broken asphalt has a blacker color than an older break. Mr. Brian Smith, who was the Streets Superintendent for LCP until shortly before Ms. Callier's accident, was shown a Google Maps Street View image of the area of the accident dated January 2017 and compared that photo with one taken by Mr. DiBenedetto. This Google

---

[2] A major reconstruction costs between $1 million and $1.5 million per mile, plus the expense of acquiring additional rights of way.

[3] The dictates of the manual have been codified into law by reference. *See*, La.R.S. 32:235.

4

Maps image showed an area where asphalt had broken off. Compared to the photo taken by Mr. DiBenedetto, Mr. Smith testified, the Google Maps image showed a much smaller break.

Mr. Dwayne Meaux, who was a drainage labor foreman in 2017, testified about the excavation of ditches along St. Esprit Road. According to Mr. Meaux, he supervised the excavation of the area near Mr. Leger's house, but that work was performed on the ditch across the street and not the ditch in front of Mr. Leger's house. Mr. Meaux has witnessed drainage issues on St. Esprit Road causing deterioration of the road, but not at the area of Ms. Callier's accident.

Mr. John Richard is a retired labor foreman in the streets department. One of his tasks was inspecting roads for areas that needed repair. He recalled the April 11, 2017, service request. He inspected the entire road on both sides. This took him about two hours. Mr. Richard recalls that his inspection began right after lunch or his break. He would mark repair spots with white spray paint. After the work was finished, Mr. Richard would reinspect the repairs to ensure they had been done properly.

Mr. Richard was shown the photos taken by Mr. DiBenedetto. He testified that this "obvious" condition was the type of condition he was looking for when he inspected St. Esprit Road. Mr. Richard testified that had this condition been present on the day of his inspection, he would have marked it and seen to it that it was repaired; therefore, he does not believe that the condition was present on April 11, 2017. However, on cross examination, Mr. Richard looked at the January 2017 Google Maps image and identified this condition as one that he would have had repaired. The Google Maps image depicts a broken area that is smaller than the one in Mr. DiBenedetto's photograph. Also, the break in the DiBenedetto photo appeared fresh to Mr. Richard.

5

Mr. James J. Valenta is a highway safety engineer and accident reconstruction expert from Michigan retained by Ms. Callier to analyze the road conditions and determine whether the proximate cause of her accident was the result of road conditions.

Mr. Valenta utilized the guidelines for roadway design established by the American Association of State Highway and Transportation Officials (AASHTO) and the *Manual* to determine that St. Esprit Road in the area of the accident posed an unreasonable risk of harm in that the lane was too narrow[4], there was no fog line, and no signs warned of the steep shoulder. Further, Mr. Valenta opined, LCP should not have allowed Mr. Leger to maintain the driveway as he did; its vertical face posed an unreasonable risk of harm to motorists who might depart the roadway. Instead, a sloped culvert should have been installed. Lastly, the foreslope of the ditch, the area closest to the road, was too steep to allow an errant motorist to correct her path back onto the roadway. That created a drop-off in excess of the AASHTO-mandated two inches.

LCP retained the services of Mr. Vernon "Dean" Tekell, a traffic engineering and accident reconstruction consultant from Lafayette, who was a traffic engineer for LCP until 1998. Mr. Tekell was asked to reconstruct Ms. Callier's accident.

Mr. Tekell looked at aerial photographs of St. Esprit Road, which indicated that the road was constructed before 1958. The AASHTO standards were not adopted into law until the 1960s, and the standards only require that roads be brought up to modern standards when they undergo reconstruction. Therefore, the AASHTO standards do not apply to the road.

---

[4] In the sixty-one feet leading to the site of the wreck, the eastbound lane varied in width between 16.8 feet and 18.1 feet, much of which, Mr. Valenta noted, is below the AASHTO minimum of nine feet per travel lane.

Examining photographs of the accident scene, Mr. Tekell noted scraping of the pavement to the west of the broken chunk of asphalt. He also noted the outline of a wheel path. These indicated to Mr. Tekell that Ms. Callier's vehicle left the road approximately fifty feet before the alleged defect, which appeared fresh based on the coloration. Mr. Tekell opined that the alleged defect, rather than causing the accident, was caused by the accident. Therefore, the alleged defect did not exist for Mr. Richard to have seen it in his inspection.

Ms. Callier's car, a Kia Optima, has a very low center of gravity. Rarely does a car with such a low center of gravity experience rollover at speeds less than 45 miles per hour. Mr. Tekell is convinced that, based on her speed and the physical damage, Ms. Callier's car rolled once and came to rest several feet before the tree she claimed it hit; there was no evidence of tree bark transferred into a joint or crack on the car, nor was there any "crush associated with it having hit a tree and bounced off." While there was a scar on the tree, it did not appear fresh to Mr. Tekell. If Ms. Callier's car indeed rolled or flipped three times, she would have been traveling faster than she testified.

Mr. Tekell agreed with Mr. Abadie that a fog line was not required on St. Esprit Road. The *Manual* prescribes a fog line on roads that see 4,000 vehicles a day and are twenty feet wide. Mr. Tekell also disagreed with Mr. Valenta's opinion regarding a "clear zone." In order to provide a clear zone, LCP would have to acquire additional right of way. St. Esprit Road was "an old horse and buggy road that was gravel at one time and was overlaid as-is as a travel surface." As such, it was never required to meet AASHTO standards.

Ms. Callier's Kia was six feet, one inch wide. The lane she was traveling was nine feet wide; thus, she had a foot-and-a-half on each side to negotiate along St. Esprit Road. The cause of the accident, Mr. Tekell opined, was that Ms. Callier was

driving too far toward the edge of the pavement and her tire left the roadway. At a speed of between thirty-four to forty-three miles per hour, Ms. Callier's Kia would have covered the distance from where it left the pavement to the culvert in about one second. This would be consistent with Mr. DiBenedetto's testimony. Ms. Callier's path described a scenario in which her vehicle left the roadway and she attempted to steer back onto it but encountered the culvert before she could.

In addition to having a low center of gravity, the Kia only had ground clearance of 5.1 inches; therefore, once her wheels left the roadway, it would have made contact with the pavement only after the drop-off exceeded 5.1 inches. St. Esprit Road has virtually no shoulder, so that would have happened early into the event.

Mr. Tekell developed his analysis of the crash based solely upon the physical evidence independent of what any witness might state.

Mr. Tekell testified that the cost of placing a fog line along St. Esprit Road would be $20,000.00 to $21,000.00. He further opined that placing a fog line might prove counterproductive because fog lines are intended to encourage drivers to drive further to the left, and this road was so narrow that it could lead to other accidents. The low speed, low traffic volume, and relatively narrow lane width would not make placing a fog line on St. Esprit Road advisable.

*The injuries*

Immediately after the accident, Ms. Callier did not experience localized complaints. She refused the offer by ambulance personnel to be transported to a hospital. The next day, she "was sore from head to toe." She went to a walk-in clinic the following Monday with complaints of pain in her neck, low back, shoulders, and left breast. Her all-over pain complaints resolved in about a week, but her low back, shoulder, and neck pain persisted.

Ms. Callier treated with Barczyk Chiropractic until February 2018, when she reported that she was pain-free. She later returned complaining of leg pain. She was referred by Barczyk Chiropractic for an MRI and then to Dr. Roy Williams, a Lafayette orthopedic surgeon.

Dr. Williams began treating Ms. Callier in June 2018. She complained of intermittent burning pain and numbness in her left leg. The MRI ordered by Barczyk showed degenerative discs and foraminal stenosis at the L3-4, L4-5, and L5-S1 levels. The MRI also showed that Ms. Callier's spine had retrolisthesis, which is a malalignment of the spine, at two levels. Dr. Williams recommended physical therapy, which provided Ms. Callier with relief of her low back pain but failed to resolve her left leg pain.

Because Ms. Callier continued to experience leg pain, Dr. Williams recommended that she undergo a lumbar epidural steroid injection, which is a fluoroscopically guided injection intended to reduce inflammation of irritated nerves at targeted locations.

This procedure was performed on October 15, 2018 and provided Ms. Callier with "pretty good relief." At her appointment in November 2018, she reported good relief, but in January 2019 her leg pain had returned. Dr. Williams suggested a second injection procedure, which was performed; however, the injection was given at a different level of the lumbar spine and did not result in the same quality of relief as the first.

In April 2019, Ms. Callier's leg pain persisted. By July, though, she had begun working with a personal trainer and her leg pain had been reduced to intermittent episodes. In October 2019, Dr. Williams discussed a third injection, which was never performed.

By July 2020, Ms. Callier reported that she had experienced a great deal of relief from working with her personal trainer, but by then her gym had closed and her pain was returning. Dr. Williams' last two appointments with Ms. Callier occurred on October 14, 2020, but she returned on October 22, 2020, with her leg pain significantly worse. A second MRI was performed that showed no changes from the earlier one. Dr. Williams felt that all non-surgical options were exhausted, and he recommended that Ms. Callier undergo a three-level lumbar decompression and intervertebral fusion.

Dr. Williams agrees that Ms. Callier will require core muscle strengthening for life but does not think that will resolve her complaints. He bases his opinions on the history Ms. Callier gave plus the lack of any medical evidence to the contrary. He admitted on cross examination that he was not aware that Ms. Callier had been discharged from Barczyk Chiropractic in February 2018 and had indicated at the time that she was pain-free. He also admitted that at Ms. Callier's October 22, 2020, appointment, his examination uncovered only subjective complaints. Her gait, lumbar lordosis, range of motion, strength, reflexes, and sensory examinations were all normal.

Dr. Neil Romero is a Lafayette orthopedic surgeon who performed an independent medical examination of Ms. Callier at LCP's request. His examination elicited normal findings. He opined that Ms. Callier sustained an aggravation of pre-existing degenerative conditions. His recommendation is that Ms. Callier undergo physical therapy and continue with strengthening exercises.

Ms. Callier had undergone breast surgeries in 2009 and 2014. These were performed by Dr. Kenneth Odinet, a Lafayette plastic surgeon. Ms. Callier denied any complaints about her breasts between the second surgery and the accident. She maintained at trial that her left breast had been bruised in the accident. However,

she testified that her left breast became very sensitive and hard. After she began to exercise with the personal trainer, Ms. Callier testified, she noticed that the shape of the left breast had changed. She did not seek medical attention for this complaint, though, until August 30, 2018, almost a year after the accident, when she returned to Dr. Odinet.

Dr. Odinet referred Ms. Callier for a mammogram and ultrasound, which demonstrated no rupture of her left implant. He advised her that an MRI would be a better tool for determining whether her implant was ruptured, but she never had the procedure performed.

On initial examination, Dr. Odinet found that Ms. Callier had a grade two capsule.[5] He noted that she had a slight collapse of the left breast at the 1:00 and 2:00 positions. A collapse usually occurs when the capsule has torn. Dr. Odinet advised the above MRI and also the possibility of removing her implant and performing a lift procedure. Neither of those was performed. Without the MRI, Dr. Odinet would not express an opinion on whether the collapse of Ms. Callier's capsule was related to her motor vehicle accident.

Not so Dr. Darrell Henderson, another Lafayette plastic surgeon, whom Ms. Callier saw after Dr. Odinet, who has recommended that Ms. Callier undergo a revision to repair the collapse, which he opines frequently result from motor vehicle accidents. According to Dr. Henderson, Ms. Callier's left breast has a definite "lump" and exhibits asymmetry compared with the right one. The torn capsule has allowed the left breast to migrate upward and outward. This will need to be surgically corrected at a cost of about $11,000.00. Dr. Henderson dismissed the lapse of time

_____

[5] According to Dr. Odinet, any time a foreign body, such as a breast implant, is placed into the human body, the natural reaction is to enclose that foreign body. The enclosure of such a foreign body is a capsule. Capsules are graded on their texture from one to four, with one feeling like a perfectly normal breast, and four feeling like it contains a hard shell accompanied by pain.

11

between the accident and Ms. Callier's first documented complaints of pain as "masking," a phenomenon in which more intense pain in other areas suppresses the lesser sensation of pain in others.

Ms. Callier is a mapper by vocation. She typically works as an independent contractor creating maps for clients in the petroleum industry. Her last such work was for David McKinney Drafting Services in Lafayette. Mr. McKinney described Ms. Callier as an expert with the ArcGis software he uses to create maps. She also learned to map using other software during the term of her contract with McKinney. However, her injuries from this accident forced Ms. Callier to take frequent breaks. Ms. Callier found other work; otherwise, she would have been laid off because of the downturn in the petroleum industry.

*Action of the trial court*

A bench trial of the matter was held on March 22- 24, 2021. Additional expert witnesses were heard in addition to those discussed above, but a discussion of the substance of their testimonies is obviated by the trial court's ruling in this matter and the status of the appeals.[6] Following the close of evidence, the trial court took the matter under advisement. The trial court issued written reasons for judgment on April 19, 2021, and the judgment was signed on June 11, 2021. That judgment awarded Ms. Callier $232,651.56, which consisted of $200,000.00 in general damages, $16,051.56 in past medical expenses, $11,000.00 in future medical expenses for breast surgery[7], and $5,600.00 in lost wages.

The trial court's written reasons found that the broken asphalt represented an unreasonably dangerous condition that existed prior to the April 11, 2017, inspection by Mr. Richard, as demonstrated by the Google Maps Street View photo of January

---

[6] Two vocational rehabilitation experts and an economist also testified.

[7] Pursuant to La.R.S. 13:5106, that money was ordered placed into a reversionary trust.

12

2017. Thus, the defect existed long enough to impute constructive knowledge of the defect to LCP. The trial court found that Ms. Callier and Mr. DiBenedetto gave credible testimony about the events of that night, and this credible testimony refuted the expert testimony of Mr. Tekell's reconstruction of the accident. No comparative fault was found on the part of Ms. Callier, as the trial court could find no authority for the proposition that a driver has a duty to drive in the center of her lane.

Ms. Callier sustained an aggravation of a pre-existing degenerative disc condition in her low back, the trial court found. It further found that she failed to prove that this aggravation persisted beyond July 2019, when her symptoms were being managed by her fitness training and did not worsen after the pandemic closed her gym. While Ms. Callier experiences occasional flare-ups, these would have occurred as a natural progression of her degenerative low back condition. Accordingly, the trial court declined to award her future medical expenses for the back surgery Dr. Williams proposed.

The tearing of the capsule of Ms. Callier's left breast implant was found by the trial court to be causally related to the accident despite the passage of time. Both Dr. Henderson and Dr. Odinet observed a tear in the left breast capsule.

The trial court found that Ms. Callier missed 224 hours of work between November 2017 and August 2018 due to her injuries. Time she lost afterward appeared to the trial court to be a consequence of market conditions in the petroleum industry.

## ASSIGNMENTS OF ERROR

LCP asserts the following as error:

1. The trial court erred in finding an unreasonably dangerous condition existed at the time of Callier's September 9, 2017 accident at 1025 St. Esprit Road that LCG had actual or constructive knowledge of and that was the cause of the accident.

13

2. The trial court erred in assessing 100% liability to LCG.

3. The trial court erred in permitting and relying on accident reconstruction testimony from James Valenta when Valenta was not requested to nor provided an opinion regarding accident reconstruction and his report did not include any opinions regarding accident reconstruction.

4. The trial court erred in awarding Callier $200,000.00 in general damages.

5. The trial court erred in awarding Callier $11,000.00 for future medical expenses related to breast surgery.

6. The trial court erred in assessing all costs of the proceedings against LCG.

Ms. Callier answered the appeal and assigns as error the general damage award and the award for future medical expense regarding the finding that the lumbar fusion surgery was not necessitated by the accident.

## ANALYSIS

*Standards of review*

The bases for liability of a public body for unreasonably dangerous road or street conditions are found in La.R.S. 9:2800 and, by extension, La.Civ.Code art. 2317. Findings of fact under La.R.S. 9:2800 are reviewed by the court of appeal under the manifest error standard. *LeBlanc v. City of Abbeville*, 18-206 (La.App. 3 Cir. 10/17/18), 259 So.3d 372. The determination of whether an accident was a cause-in-fact of a plaintiff's injuries is also reviewed under the manifest error rule. *Mart v. Hill*, 505 So.2d 1120 (La.1987). Allocations of comparative fault are also reviewed under the manifest error standard. *Watson v. State Farm Fire and Cas. Ins. Co.*, 469 So.2d 967 (La.1985). The existence of a causal relationship between an accident and a plaintiff's alleged injuries is similarly reviewed. *Housley v. Cerise*, 579 So.2d 973 (La.1991).

> [The manifest error] test dictates that a reviewing court must do more than simply review the record for some evidence which supports

14

or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.

Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.

*Stobart v. State through Dep't of Transp. & Dev.*, 617 So. 2d 880, 882 (La. 1993)(citations omitted). "[W]here there are two permissible views of the evidence, the factfinder's choice between them *cannot* be manifestly erroneous." *S.J. v. Lafayette Par. Sch. Bd.*, 09-2195, p. 13 (La. 7/6/10), 41 So.3d 1119, 1127(emphasis added). We cannot simply look to the trial court's written reasons to see whether it was wrong but must look to the *whole* record to make that determination.

The decision to admit or exclude expert testimony is reviewed under the abuse-of-discretion standard. *Bethley v. Keller Const.*, 01-1085 (La.App. 1 Cir. 12/20/02), 836 So.2d 397, *writ denied*, 03-228 (La. 4/21/03), 841 So.2d 792. Assessments of costs of court are similarly reviewed to determine whether the trial court abused its discretion. *Roach v. State, Dep't of Transp. and Dev.*, 20-211, 20-212 (La.App. 3 Cir. 9/22/21) 329 So.3d 974, *writ denied*, 21-1527 (La. 1/12/22) ___ So.3d ___. And finally, awards of damages will only be disturbed on appeal when there has been a clear abuse of discretion. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976).

A conclusion represents and abuse of discretion when it is "reached capriciously or in an arbitrary manner." *Torrance v. Caddo Par. Police Jury*, 119 So.2d 617, 619 (La.App. 2 Cir.1960).

*Liability of LCP*

Louisiana Revised Statutes 9:2800 provides, in pertinent part:

A.  A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.

. . . .

C.  Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.

D.  Constructive notice shall mean the existence of facts which infer actual knowledge.

The elements a plaintiff must prove to establish liability under La.R.S. 9:2800 have been enunciated as follows:

> [T]he plaintiff must prove (1) the defendant owned or had custody of the thing that caused the damage; (2) the thing was defective in that it created an unreasonable risk of harm to others; (3) the defendant had actual or constructive knowledge of the defect or unreasonable risk of harm and failed to take corrective action within a reasonable time; and (4) causation.

*Ambrose v. City of New Iberia*, 08-1197, p. 2 (La. App. 3 Cir. 4/1/09), 11 So. 3d 34, 37.

> A municipal authority is deemed to have constructive notice if the defect existed for such a period of time that by exercise of ordinary care and diligence, the municipal authority must have known of its existence, and the municipal authority had a reasonable opportunity to guard the public from injury by remedy of the defect.

*Id.*

The fact that LCP had custody and control over St. Esprit Road was well established.

16

> Whether a thing presents an unreasonable risk of harm is a matter particular to the circumstances of each case; our analysis in this case must consider the uses for which sidewalks are designed and intended, because "the requirement of reasonable safety implies *reasonable safety for any lawful or proper purpose.*" (emphasis added). *U.S.F. & G. Co. v. State, Dept. of Highways,* 339 So.2d 780, 785 (La.1976); see also *Oster,* 582 So.2d at 1289; *Hardie v. Bestway Grocery,* 620 So.2d 937 (La.App. 3 Cir.), *writ denied,* 626 So.2d 1164 (La.1993).

*Morell v. City of Breaux Bridge*, 94-1378, p. 5 (La.App. 3 Cir. 5/31/95), 660 So.2d 882, 884, *writ denied*, 95-2608 (La. 1/12/96), 666 So.2d 321.

The trial court discounted Mr. Valenta's opinions regarding whether the defect was unreasonably dangerous, but nonetheless found that the lack of signage, additional lighting, or a fog line, coupled with the narrowness of the travel lane posed an unreasonable risk of harm. The trial court stated that it "knows of no requirement for driving in the center of the lane, and it does not appear unreasonable for a motorist to avoid driving near the centerline of a dark, narrow roadway where oncoming vehicles might be encountered." Regarding the trial court's last observation, we will further consider this contention when we discuss the allocation of fault. Louisiana law has long held that the duty to maintain road shoulders encompasses the risk that an errant motorist might stray off the road. *See Bozeman v. State*, 34,430 (La.App. 3 Cir. 4/4/01), 787 So.2d 357, *writ denied*, 01-1341 (La. 6/29/01), 794 So.2d 813 (in which the court of appeal found that a drop-off of two the three inches constituted an unreasonable risk of harm). We find that the trial court did not manifestly err in finding that the defect posed an unreasonable risk of harm.

There are two permissible views of the evidence regarding constructive notice. The January 2017 Google Maps Street View image of a defect in the same area as the asphalt break involved in this accident leads to a permissible inference that the

defect existed prior to Mr. Richard's inspection of the road.[8]  Another permissible inference is that the LCP crew repaired the defect after Mr. Richard's accident, and the asphalt was broken when Ms. Callier's car left the roadway.  Two experts, Mr. Tekell and Mr. Valenta, arrived at differing conclusions regarding how long the defect appeared to exist.  One reason given by the trial court in its ruling was that Mr. Tekell's opinions differed from the testimonies of Ms. Callier and Mr. DiBenedetto, whom the trial court found credible.  A choice between these permissible views cannot be manifestly erroneous.  *S.J.*, 41 So.3d 1119.  A finding founded on credibility is given the utmost deference.  *Stobart*, 617 So.2d 880.  Even if one disregards the testimony of Mr. Broussard,[9] the record still supports the trial court's conclusion that the defect existed for such a period of time that LCP should have discovered and corrected the condition.

Ms. Callier and Mr. DiBenedetto both testified that the accident occurred in the immediate vicinity of the defect.  The only evidence to the contrary was presented by Mr. Tekell, who identified scrape marks more than fifty feet from the defect, which he opined were caused by the undercarriage of Ms. Callier's car when it departed from the roadway long before it reached the area of the defect.  The trial court found that this conflicted with the Callier-DiBenedetto account, which it found credible.  The trial court found no scrape marks prior to the defect.  We find no manifest error in its conclusions.

The trial court found no basis for comparative fault because Ms. Callier's vehicle encountered the defect abruptly.  As noted above, the trial court indicated

---

[8] This court's review of the before- and after-accident photos appears to show that the defect is depicted in both.

[9] The trial court's written reasons on the issue of constructive notice does not mention Mr. Broussard's testimony.  It pinned constructive notice solely on a comparison of the Google Maps Street View photo with the DiBenedetto photo.

that it was aware of no duty to drive in the center of the lane and particularly not near the centerline of the road because of the chance that oncoming motorists might be encountered. We do not entirely agree.

Ms. Callier testified that she was not thoroughly familiar with the road. Yet she had lived in the area for three years and possessed sufficient familiarity with it to know that it considerably shortened the drive from Pogie's to her house and avoided heavier traffic encountered along other routes. Mr. DiBenedetto testified that Ms. Callier's headlights sufficiently illuminated the road. And we disagree that a chance encounter with oncoming cars mitigated against Ms. Callier driving further to the left of her lane in the absence of that circumstance presenting itself. There were no oncoming cars, and Ms. Callier was familiar with the road; if she observed an oncoming vehicle, she should have easily been able to steer somewhat to the right and still not encounter this defect, which occupied a very small portion of the very far right of the travel lane. A motorist is charged with the duty of exercising reasonable control over her vehicle, including being watchful for road hazards and staying within her lane of travel. *Foster v. ConAgra Poultry, Inc.*, 95-793 (La.App. 3 Cir. 2/14/96), 670 So.2d 471, *writ denied*, 96-645 (La. 4/26/96), 672 So.2d 674. The operation of her vehicle too far to the right, given her knowledge of the road and the dark nighttime conditions, constitutes comparative fault.

"When an appellate court finds an apportionment of fault by the trial court clearly erroneous, it should raise or lower it to the highest or lowest point reasonably within the trial court's discretion." *Burtner v. Lafayette Par. Consol. Gov't*, 14-1180, p. 9 (La.App. 3 Cir. 4/15/15), 176 So.3d 1056, 1063, *writ denied*, 15-938 (La. 6/19/15), 169 So.3d 350 (*citing Clement v. Fry*, 95-1119, 95-1165 (La. 1/16/96), 666 So.2d 607). Our review of the record leads us to conclude that the lowest percentage

19

of fault that could be assessed to Ms. Callier is twenty-five percent, and we amend the trial court's judgment to assess her with that percentage of comparative fault.

We have already outlined Ms. Callier's relevant medical treatment history following the accident. LCP and Ms. Callier appeal elements of the judgment related to future medical treatment: LCP appeals the trial court's award of future medical for breast surgery while Ms. Callier appeals the denial of an award for back surgery.

Again, both the necessity of breast surgery or back surgery is reviewed under the manifest error standard. Therefore, in order to reverse, we must conclude that there is "*no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong.*" *Menard v. Lafayette Ins. Co.*, 09-1869, p. 14 (La. 3/16/10), 31 So.3d 996, 1007 (emphasis in original). We find no manifest error in either the award of future medical expenses for the breast surgery, which was necessitated by the capsule tear that no doctor was willing to say was not related to the accident, or the denial of future medical expenses for lumbar fusion surgery, given that the condition of Ms. Callier's back pre-dated the accident and the fact that she achieved relief through exercise, which Dr. Romero has opined is what she needs. We decline to reverse either ruling of the trial court.

LCP maintains that the general damage award should be reduced to $40,000.00 at most. Its position is based upon the contention that Ms. Callier suffered, at most, a year-and-a-half aggravation of a pre-existing degenerative disc condition in her back. This position ignores the fact that in addition to her low back, Ms. Callier also sustained a torn or ruptured capsule of her left breast implant. It also ignores the fact that the aggravation of Ms. Callier's back condition caused symptoms to a condition that was previously asymptomatic. We do not find that the trial court's award was made arbitrarily and can find no abuse of discretion.

20

"Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause. Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." La.Code Civ.P. art. 1920. The allocation of costs, then, is within the trial court's broad discretion and will only be reversed on a showing that its discretion was abused. *Schneider v. Mayo*, 94-527 (La.App. 3 Cir. 12/7/94), 647 So.2d 606, *writ denied*, 95-27 (La. 2/17/95), 650 So.2d 254. LCP argues that because it should not be cast with liability, it should not be assessed with costs. Given that we affirm the trial court's ruling on liability, amended to assess comparative fault, we find no abuse of the trial court's discretion.

## CONCLUSION

The trial court did not manifestly err in finding that an unreasonably dangerous defect existed on St. Esprit Road, that the defect was a cause-in-fact of Ms. Callier's accident, or that LCP had constructive notice of the defect. The trial court did manifestly err in finding Ms. Callier free from fault, and we amend its judgment to assess her with twenty-five percent comparative fault. We affirm the trial court's awards of general damages and future medical expenses for Ms. Callier's breast surgery. We affirm the trial court's decision to not award Ms. Callier future medical expenses for low back surgery. We affirm the trial court's assessment of court costs.

All costs of this appeal, in the amount of $15,884.65, are taxed as costs to defendant/appellant, the Lafayette City-Parish Consolidated Government.

**AFFIRMED AS AMENDED.**

21