# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 24-273 consolidated with 24-274, 24-275, 24-276, 24-277

**LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT**

**VERSUS**

**JAMES L. CLAUSE AND CONNIE GUILLORY CLAUSE**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2022-6477 C/W 2023-0326,
2023-0413, 2023-0414, 2023-0898
HONORABLE LAURIE A. HULIN, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Van H. Kyzar, and Charles G. Fitzgerald, Judges.

**MOTIONS FOR LEAVE OF COURT TO FILE**
**AMICUS CURIAE BRIEFS GRANTED.**
**JUDGMENT AFFIRMED.**

**Lawrence E. Marino**
**Paige Casselman Beyt**
**Oats & Marino**
**100 E. Vermilion Street, Suite 400**
**Lafayette, LA 70501**
**(337) 233-1100**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Lafayette City-Parish ConsolidatedGovernment**

**Gary McGoffin**
**John S. Cook**
**Durio, McGoffin, Stagg & Guidry**
**220 Heymann Boulevard**
**Lafayette, La 70503**
**(337) 233-0300**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **James L. Clause**
    **Connie Guillory Clause**

**Patrick M. Wartelle**
**Leake & Anderson, L.L.P.**
**600 Jefferson Street, Suite 600**
**Lafayette, LA 70501**
**(337) 233-7430**
**COUNSEL FOR AMICUS CURIAE:**
    **Louisiana Energy and Power Authority**

**Sean D. Moore**
**Brett P. Fenasci**
**Entergy Services**
**639 Loyola Avenue, 26th Floor**
**New Orleans, LA 70113**
**(504) 576-7048**
**COUNSEL FOR AMICUS CURIAE:**
    **Entergy Louisiana, LLC**
    **Entergy New Orleans, LLC**

**GREMILLION, Judge.**

In this expropriation case, consolidated with cases involving the neighbors of the defendants/appellees, James L. and Connie Guillory Clause, the Lafayette City-Parish Consolidated Government (LCP) appeals the award of severance damages and attorney fees and seeks repayment of damages and fees in excess of what this court finds appropriate.

Further, Entergy Louisiana, LLC, Entergy New Orleans, LLC (collectively, "Entergy") and the Louisiana Energy and Power Authority (the Authority) have each sought permission to file amicus curiae briefs.

For the reasons that follow, we grant the motions to file amicus curiae briefs and affirm the judgment of the trial court.

## FACTS

Defendants own property on Butcher Switch Road in Lafayette Parish. LCP was attempting to upgrade its electrical service in the area. LCP offered the Clauses $2,522.00. This offer was rejected. LCP sued to acquire the utility servitude across the street side of defendants' property, and that of their neighbors on Butcher Switch Road, to replace existing wood poles with galvanized steel poles.

The matter proceeded to trial on August 30, 2023.

LCP's Chief Electrical Engineer, Hunter Boudreaux, testified that the new 75-foot-tall, 21.6-inch diameter, galvanized steel poles will replace the existing 43.8-foot-tall wooden poles, which are 14.49 inches in diameter. These sturdier poles are necessitated by the installation of a new electrical substation north of Interstate 10 and east of Interstate 49, an area that has never had a substation.

The lines along Butcher Switch Road have never included transmission lines (lines that send power from one substation to another), only distribution lines (lines that service electrical customers). The distribution lines would be placed at their current height and the transmission lines above those. All lines will be placed on the road side

of the poles to minimize the depth of the servitude. Boudreaux testified that in his experience, galvanized steel poles detract from the surrounding scenery less than wooden poles because the galvanized steel blends into the sky and background better.

According to Boudreaux, the National Electrical Safety Code determines what clearances, vertical and horizontal, must be given for distribution and transmission lines. LCP's proposed lines would mandate between thirteen and fifteen feet of clearance, which is why it sought the fifteen feet of servitude.

LCP currently has an existing roadway servitude extending thirty-five feet from the centerline of East Butcher Switch. The existing poles are located at the edge of that servitude. While the lines will extend over defendants' property because they overhang an existing servitude in favor of LCP, the defendants are not compensated for those lines.

Although a utility servitude in favor of the Southwest Louisiana Electrical Membership Corporation (SLEMCO) existed across the property, its dimensions were never established; therefore, LCP sought a fifteen-foot-deep servitude. At some point the Lafayette Utility System "purchased" many of SLEMCO's customers. The exact location of that servitude, in fact, was not established and currently is not known. According to Bradford Habetz Millett, a Professional Land Surveyor hired by LCP to perform a route survey on the proposed servitude, she did not attempt to establish the location of that servitude. The 1958 act that created the servitude did not specify its depth. The property is also encumbered by a 1982 servitude in favor of South Central Bell Telephone Company (Bell). That servitude is ten feet deep and "parallel and adjacent to the North right of way line of Butcher Switch Road for a distance ± 200 feet."

To establish the value of the taking, LCP called Michael Cope, a licensed real estate appraiser who has performed at least 3,500 appraisals in his career, including approximately 1,600 servitude appraisals. Cope is a recognized specialist in right of

2

way appraisal by the International Right of Way Association. The trial court accepted him as an expert in general appraisal.

Cope testified that he valued the property pre-taking, a value of the parcel being taken, and the after-taking value. To arrive at these values, Cope employed a sales comparison analysis to compare the area of the servitude and compare it to vacant land that had been sold in the area in the thirty months before the taking. Cope found four comparable sales in that period. Those properties sold for between $1.11 and $2.51 per square foot. The property closest to defendants' home was one block away and sold for $1.60 per square foot. Cope opined that defendants' land was worth $2.22 per square foot.

Cope did not adjust his valuation to factor the SLEMCO servitude that already encumbered the property, but he did the Bell servitude. Cope also performed a sales comparison analysis of the defendants' home. The Clauses' home "is finished out to a higher level, both quality of materials to quality of craftsmanship and workmanship. . . [M]ost of the houses in and along East Butcher Switch Road and in the subdivision right behind it, they are just not quite at the same level of overall quality as the Clause house[.]" Cope's market analysis, then, compared homes further afield. Cope valued the home and land at $365,325.00.

To adjust for the after-taking value, Cope compared sales of vacant lots in the area that were encumbered by servitudes with those that were unencumbered. He opined that the taken parcel was devalued by eighty percent, giving a value of $2,522.00.

Cope opined that there was no after-taking difference in the value of the untaken portion of defendants' property; in other words, there were no severance damages. In fact, Cope argued that "there is no severance damage to the remainder from the acquisition of transmission line servitudes." That is, no severance damages occur unless the analysis indicates that the property has sustained "100-percent impact[.]" Severance damages, then, can almost never result from transmission line servitudes.

To bolster this opinion, Cope also performed a sales comparison analysis of Lafayette-area homes with transmission lines similar to those proposed by LCP. All of the properties he included in this analysis were "very similar to the subject property." Cope also surveyed the listing and selling agents that participated in the transaction to verify that the transactions were all arm's-length sales. These agents indicated that they never even considered the existence of the poles and servitudes in pricing the homes. The buyers were also aware of the poles and servitudes. This investigation led Cope to conclude that the existence of the poles and lines were inconsequential to the pricing of the homes.

Cope also received engineering data from the utility services in the Lafayette area. This data showed that Lafayette residential areas are crisscrossed with 69-kilovolt lines like those proposed on East Butcher Switch Road.

Cope performed an analysis the day before trial. His opinions had not changed as a result.

Defendants cross-examined Cope with regard to his training as an appraiser. Cope's father, Gene Cope (Gene), was formative in Cope's training. To the best of Cope's knowledge, Gene never found severance damages in a transmission line case. Cope himself has found severance damages in a transmission line case when the line crossed the encumbered property in a way that rendered the remaining property unworthy of development: "It wasn't from the actual pole and the line. It was basically because the physical footprint of the site had been altered by the location of the line on the property and it's [sic] route of travel."

Cope disagreed with the proposition that people only purchase homes near transmission lines because they cannot afford other lots. In fact, his father's home sat beneath a 230-kilovolt line on an H-frame tower. That home was about 4,500 square feet and had an in-ground pool.

Defendants offered two witnesses: Jim Keaty, a Lafayette realtor, and Caroline Landry, an appraiser.

Mr. Keaty owns a realty company that employs about seventy realtors. His firm has been involved in approximately 6,000 transactions. Eighty percent of those transactions involve residential properties. Keaty was contacted by Landry, who solicited his opinion about the impact on marketability of a home located near "high-powered lines[.]" Based on his experience, Keaty opined that those homes located near high-powered lines are less marketable. While Keaty could not quantify the impact on marketability, he offered that, "there is no one that's ever asked us, 'I'd like to be near a power line.'" Keaty testified that of the 6,000 or so transactions, he could recall two in which the presence of power lines made the properties harder to sell.

Landry testified that the present case was her first appraisal of an overhead utility servitude. She valued the land pre-taking, valued the parcel being taken, and valued the remaining property post-taking. She appraised the value of the servitude at $3,751.83. She performed a sales comparison appraisal to arrive at this figure.

In determining whether the defendants sustained severance damages, Landry conducted extensive research in publications and national market studies that reviewed thousands of transactions. Landry's research was confined to severance damages from overhead power lines. Landry opined that nationwide studies were relevant to the Lafayette housing market, "because there is a nationwide pattern of response to how the market responds to overhead power lines and how it affects property values." There is insufficient data in the Lafayette market to allow a paired data comparison. In other words, Landry

> could find no paired data that showed the effect on market value of a
> property that did not have these types of structures and then sold
> immediately following having similar structures in front of the home to
> derive of what the effect on these types of structures would be, on market
> value. The data wasn't available.

Therefore, Landry reviewed over thirty market surveys and conducted market interviews to arrive at an opinion on severance damages.

The first step in determining severance damages was to value the homes traditionally. Then Landry ascertained what she believed the percentage of impact of the given lines would be on the homes. Landry opined that the home would lose twenty-five percent of its value as a result of the LCP servitude.

In the context of the present case, the proposed poles are being installed "particularly close to the homes" and "immediately in front of the homes." The larger poles impact the esthetics of the homes. The existing poles are what one would expect in an older development; the larger poles are not.

Landry criticized Cope's analysis. She opined that Cope failed to isolate the variable of overhead power lines. According to Landry, Cope failed to account for disparities between the properties he included in his analysis. None of the properties in Cope's analysis "looked alike." "[A]ll of the examples he provided featured utility poles that had probably been there for 60-plus years." Other disparities distinguished the homes Cope considered from the defendants' property.

Landry opined that the Clauses' home experienced severance damages of $120,000.00.

On cross-examination, LCP extensively questioned Landry about the sources upon which her opinions were based. A 2019 peer-reviewed article in *The Appraisal Journal*, "High-Voltage Transmission Lines and Residential Property Values in New England: What has been Learned," by Dr. James A. Chalmers, describes the methodology whereby an appraiser can identify the "small set of properties . . . for which there is a significant probability of an adverse sale price effect" due to proximity to the right-of-way, visibility of the structures, and the type of encumbrance. "Properties Near Power Lines and Valuation Issues: Condemnation or Inverse Condemnation?" by David R. Bolton, published by the Southwest Legal Foundation in

6

the 1993 *Proceedings of the Institute on Planning, Zoning and Eminent Domain*, argued that proximity to power lines does not differ from proximity "to a landfill, a junkyard, or a haunted house." Attorneys should advocate for defendants in takings to receive damages due to loss of market value. Landry conceded that none of the articles address markets in Louisiana.

Following evidence and argument, the trial court took the matter under advisement. On September 25, 2023, the trial court issued reasons for judgment. The court found it "unconscionable" that LCP did not factor severance damages. Further, the trial court found that it defied common sense to conclude that increasing the servitude and installing taller and thicker poles would not impact the value of defendants' property:

> In the case before the court, the poles will be eight stories high. They will also be wider than the current poles. The proposed placements of these lines will be in the front of the houses. They will be closer to the Defendant's [sic] houses and driveways. They will be more of an obstruction to the front facade. It appears to the court one pole may be placed on the inside of the standing landowner[']s fence. The court finds that the transmission lines will interfere with the landowners['] aesthetic beauty and serenity of their property. It is common sense that will affect the pool of potential buyers and lower the market value of their home.

The trial court found Landry to be a more credible witness than Cope:

> [H]er opinion is more in line with reason and common sense and based on an objective study. She opines that the installment of utility poles that are 33% larger and 72% greater in height than the existing poles is unappealing to most market participants. Defendant's [sic] appraiser estimates severance damages of 25% of the total market value of each Defendant's home.

The trial court awarded defendants $123,751.83. Judgment was signed on November 27, 2023. That judgment also assessed attorney and expert witness fees of $73,254.90. This appeal followed.

## ASSIGNMENTS OF ERROR

> The Trial Court's award of severance damages was manifestly erroneous because the Trial Court relied on "common sense" instead of — and contrary to — the competent evidence introduced at trial, in basing the award on Defendants' appraiser's unsupported opinion.

A. Landry's opinion of severance damages is not based on actual evidence or sound reason, and therefore cannot support the Trial Court's award.

B. Cope's opinion of severance damages was based on actual current market evidence in Lafayette, and further shows that Landry's opinion is unworthy of belief.

If this Court reverses the severance damage award, then the attorney and expert fee award is excessive and should be reduced.

If this Court reverses the severance damage award or reduces the fee awards, this Court should order Defendants to repay their respective portions of the excess payment to LCG.

## DISCUSSION

### *Amicus Curiae Briefs*

Uniform Rules, Courts of Appeal, Rule 2—12.11 provides:

Amicus curiae briefs may be filed only upon motion by the applicant and order of the court. The motion shall identify the interest of the applicant, state that the applicant has read the briefs of the parties, and state specific reasons why the applicant's brief would be helpful to the court in deciding the case. Amicus curiae may not request oral argument.

Entergy and the Authority have set forth sufficient grounds for filing amicus curiae briefs. They and their constituents could potentially be impacted by the decision of this court. Each attacks the methodology employed by Landry in the assessment of severance damages. Therefore, we grant their motions to file amicus curiae briefs.

### *On the Merits*

A person's property is subject to expropriation by the State of its political subdivisions only for public purposes and upon payment of just compensation to the owner. La.Const. art. 1, § 4. Just compensation means that the owner is "compensated to the full extent of his loss." La.Const. art. 1, § 4(B)(5). "Except as otherwise provided in this Constitution, the full extent of loss shall include, but not be limited to, the appraised value of the property and all costs of relocation, inconvenience, and any other damages actually incurred by the owner because of the expropriation." *Id.* Severance damages represent the diminution in market value of the remaining property caused by

8

the taking. *Trunkline Gas Co. v. Verzwyvelt*, 196 So.2d 58 (La.App. 3 Cir.), *writ refused*, 250 La. 738, 199 So.2d 180 (1967).

A court of appeal's review of a trial court's determination that damages from a taking are owed and the amount thereof is limited to the manifest error standard. *State, Dep't of Transp. & Dev. v. Knoll & Dufour Lands, LLC*, 13-399 (La.App. 3 Cir. 10/23/13), 158 So.3d 1. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Stobart v. State, through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993). We are admonished that "[i]f the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Sistler v. Liberty Mut. Ins. Co.,* 558 So.2d 1106, 1112 (La.1990).

> "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous.
>
> . . .
>
> Nonetheless, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, a reviewing court may well find manifest error. Where such factors are not present, however, and a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*S.J. v. Lafayette Par. Sch. Bd.*, 09-2195, p. 13 (La. 7/6/10), 41 So.3d 1119, 1127–28 (citations omitted). This rule applies to the testimony of experts: "Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error." *Lasyone v. Kansas City S. R.R.*, 00-2628, p. 13 (La. 4/3/01), 786 So.2d 682, 693. Deference is not owed the trial court's credibility assessment when "the stated reasons of the expert are patently unsound." *Id*.

This appeal centers on the conflicting testimonies of Cope and Landry. The trial court chose to credit Landry's testimony over Cope's. LCP argues that Landry cherry-picked articles that agreed with her position, and many of the references in the articles she relied upon found no impact from the presence of utility lines. This LCP argues, indicates that the defendants "failed to present *competent* evidence to support [Landry's] opinion."

On the other hand, the alternative expert testimony presented by LCP discounted the possibility of a property sustaining severance damages except when it has been 100% impacted by the servitude. The trial court found this testimony incredible. The trial court assigned reasons explaining why it chose to discount Cope's testimony.

After reviewing the entirety of the record, we are not convinced that Landry's stated reasons are patently unsound. As outlined above, Landry undertook a thorough investigation into the impact on market value of utility lines. The trial court had one expert testifying that severance damages will virtually never result from the installation of eight-story utility poles almost two feet in diameter and another testifying that this type of taking can result in severance damages. The trial court's determination cannot be found manifestly erroneous.

## DISPOSITION

The judgment of the trial court is affirmed. All costs of this proceeding, totaling $11,173.53, are taxed to the Lafayette City-Parish Consolidated Government.

**MOTIONS FOR LEAVE OF COURT TO FILE AMICUS CURIAE BRIEFS GRANTED. JUDGMENT AFFIRMED.**